# IN THE SUPREME COURT OF IOWA

No. 90 / 05–1059

Filed February 29, 2008

**BOARD OF DIRECTORS OF AMES COMMUNITY SCHOOL DISTRICT,**

Appellant,

vs.

**DENNIS CULLINAN,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Story County, Kurt L. Wilke, Judge.

School district board of directors appeals from a district court order reversing the board's termination of a coaching contract. **DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED.**

Ronald L. Peeler of Ahlers & Cooney, P.C., Des Moines, for appellant.

David J. Dutton and Corey R. Lorenzen of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellee.

**LARSON**, **Justice**.

The board of directors of the Ames Community School District terminated the coaching contract of Dennis Cullinan under the authority of Iowa Code sections 279.15–.19A (2003). Cullinan appealed to an adjudicator, pursuant to Iowa Code section 279.17, who reversed the termination. The board sought judicial review, the district court affirmed, and in a two-to-one decision, the court of appeals affirmed as well. On further review, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand.

## I. Facts and Prior Proceedings.

Dennis Cullinan was employed by the Ames Community School District in 1997 as both a high school social studies teacher and head boys' basketball coach. (Effective in 1985, a separate contract for coaching is required, independent of any contract for teaching. *See* Iowa Code § 279.19A. It is only Cullinan's coaching contract that is at issue here.). At the end of the 1997–98 school year, Cullinan's probationary status was extended for a year as the result of complaints the school administration had received regarding Cullinan's coaching—particularly his threatening and intimidating treatment of student-athletes and his use of profane language directed at the student-athletes. Five basketball players, including a returning letterman, quit during the season. A memo to Cullinan from the athletic director on April 14, 1998, in connection with the extension of his probation, stated:

> You are hereby notified that major concerns with the Boys Basketball Program exist that must be addressed and corrected during 1998–99.

The memo stated that the school expected the

> [c]reation of a Less Threatening Environment for Players. Again, we must work to end the public perception that a few

of your athletes have been threatened and intimated. *There must not be any evidence that threats and intimidation are being used as a motivational tool in any manner. . . .* It is expected that significant improvements in all areas will be realized during the next school year. As always, members of the District Athletic Administration will be continually available to offer any additional assistance necessary to help you tackle these important issues.

(Emphasis added.)

This memo essentially restated principles that were already emphasized by the Ames School District in both the parent-athlete handbook and the coach's handbook. The parent-athlete handbook stated, as the first of five "basic principles" that

> **[t]he welfare of the kids comes first.** In athletics there are numerous opportunities for coaches to exploit kids in order to win games, and we can all recount instances where this has happened. The physical, mental, and emotional well-being of our athletes must at all times be our primary concern.

The "coach's handbook" stated:

> Your leadership is vital to the end. It is expected to be of the highest quality exemplifying to the participants, student spectators, and adult spectators, the individual and team the qualities to be developed through our activities program. Measurement of success beyond the tangible performance record would be the intangible personality development and self-esteem factors that are a product of the major objectives of our athletic program.
>
> Because the nature of your responsibilities are in the "public's eye," the district expects that your behavior be above reproach at all times, both on and off the playing field, and that your objectives and expectations be high and conform with the overall philosophy of our school. Good sportsmanship by your team should be modeled by you and your staff.

The coach's handbook also directed: "In practice and competition refrain from swearing and profane language."

Cullinan received a satisfactory written evaluation from the athletic director in May 1999 and was offered a new contract for the 1999–2000

school year. No further concerns were raised regarding Cullinan's coaching until the 2001–02 school year, when he became the subject of numerous student and parent complaints. During the 2001–02 school year, captains of the basketball team met with one of Cullinan's assistants and Cullinan himself to complain about Cullinan's treatment of team members.

One player and his father filed seven harassment complaints, alleging incidents of name-calling and profanity by Cullinan during the 2000–01 season. The athletic director investigated these complaints and found they had merit, although they did not meet the harassment-policy requirement that the acts complained of be "sexual []or discriminatory in nature." The results of the harassment investigation were considered by the administration as a part of a larger inquiry prompted by other parents' complaints filed collectively on May 10, 2002. On that date, a packet of material was delivered to the school administration entitled "Parents of Ames High Basketball Players vs. Dennis Cullinan." The packet contained a copy of the school's harassment policy and sixteen letters from fifteen families outlining complaints primarily concerning Cullinan's demeanor toward athletes, and the decreasing interest in the basketball program that resulted.

The authors of the letters stated in their summary of complaints that their concerns were not based on playing time or Cullinan's lack of basketball knowledge, were not about a single event, and were not about the team's win/loss record. Rather, the parents stated that their concerns:

> **ARE** about an environment that impacts young men's confidence, self esteem and lives on and off the court.

> **ARE** about long term behaviors over a number of years by Coach Cullinan that creates a negative, hostile environment.

**ARE** about parents and athletes that are afraid to come forward for fear of retribution or becoming the person with increased focus for criticism by the coach.

**ARE** about young men who love basketball, who walk away because of the environment.

**ARE** about a coach who advises injured players to not see a doctor, because they may receive medical restrictions, rather than showing concern for the health and well being of the athlete.

**ARE** about a coach who ignores the rules of the Iowa High School Athletic Association setting a poor example for ethical behavior for the young men.

**ARE** about a coach who can talk a good story, but cannot "walk the talk."

In response to the "Parents vs. Cullinan" complaints, Cullinan outlined his positive influence on the basketball program and provided several letters of support—primarily from fellow coaches familiar with Cullinan and his basketball program. The complaints and Cullinan's response were investigated by the athletic director, principal, and superintendent. On June 5, 2002, the athletic director summarized his conclusions and noted that Cullinan had not heeded the prior requirements set out in the 1998 probation-extension memo. The June 5 memo stated:

> What complicates the current concerns in our boys' basketball program even further is that issues about Mr. Cullinan's style and demeanor were addressed in a memorandum dated April 14, 1998, that was placed in his personnel file by former Ames High A.D. Dave Posegate. Specifically, Mr. Posegate's memo states the following:
>
> - "Individuals must be given a sense of self-worth and an understanding of their overall importance to the team."
>
> - "There must not be any evidence that threats and intimidation are being used as a motivational tool in any manner."
>
> . . . .

My recommendation is that the district's course of action involves an inclusive review of all information at hand—Mr. Posegate's memo, this memo, the harassment investigation, all documents provided by the parents, and all documents provided by Mr. Cullinan. The goal of the undertaking must be to bring closure to this issue once and for all. *Changes are necessary. Either Mr. Cullinan needs to change how he addresses and interacts with his players or the district needs to change the person responsible for leadership in the boys' basketball program.*

(Emphasis added.)

This memo was followed by a memo from the assistant superintendent, Tim Taylor, to Cullinan dated July 2, 2002, outlining the administration's perceptions of Cullinan's performance and directing Cullinan to take corrective measures. This memo, compiled following discussions with the athletic director and the superintendent, stated:

As you are aware, your professional judgment as an athletic coach is under constant scrutiny from students and parents as well. By failing to meet expectations you seriously jeopardize your credibility, place the district in an awkward situation, and tarnish your own reputation.

The behavior in question is the alleged and perceived intimidation and emotional abuse and the alleged and perceived fear of retribution, by you, against student athletes under your control as members of the varsity boys basketball program. Such behavior is not consistent with our standards of conduct and is unacceptable. Several parents of athletes have stepped forward to express their belief that fear appears to be the main motivator used by you as a coach and because, in their opinion, no real relationship exists between the players and the head coach, it is in the best interests of their sons to not participate in the varsity basketball program in the future. These parents have also requested your immediate termination as Head Varsity boys Basketball Coach at Ames High. *Of great concern is that this is not a "new" issue. A letter does exist in your personnel file and meetings for remediation of identical problems within the boys' basketball program are documented from 1998.*

(Emphasis added.) The memo then included a plan of remediation, which would result in

[d]emonstrating a positive and nurturing attitude with student-athletes

A professional response to offered refinements found within this document

A thorough understanding that intimidation through language and action will not be tolerated and do not fit with the District efforts in teaching and promoting respect for others.

The plan of remediation included the following provision, which has become a focal point of this appeal:

It is critical that in the future, when handling or dealing with acute individual student-athlete corrections, that these corrections must be:

Done away from the group setting or directed to the group as a whole

Done in the presence of an assistant coach or in the presence of the student's counselor or parent.

Following this memo, Cullinan received a satisfactory year-end evaluation for the 2002–03 school year. However, the athletic director emphasized that the district would "continue to monitor and expect this coaching style to continue well into the future."

Unfortunately, Cullinan's coaching was again called into question on December 16, 2003, when Cullinan is alleged to have failed to comply with the July 2, 2002 directive prohibiting one-on-one "acute individual student-athlete corrections." Alex Thompson, a player, failed to follow Cullinan's coaching instructions during a game, resulting in a turnover. After the game, Cullinan sent an assistant to bring Thompson to him. It is undisputed that Thompson and Cullinan met in a hallway without parents or other adults present and out of earshot of the assistant coaches, in apparent violation of the administration's directive of July 2. Cullinan admitted he met with Thompson, but the tenor and purpose of

the meeting is in dispute. Thompson claimed it was intimidating. Cullinan claims that the meeting was not corrective, and furthermore, the July 2 directive regarding one-on-one meetings was no longer in effect. Regardless of the purpose or tenor of the meeting, Thompson's parents complained about the meeting to the superintendent the next day.

The administration investigated, concluding Cullinan violated the directive and suspended him for two games without pay. On March 23, 2004, Michael McGrory, principal, wrote a memo to Cullinan following a meeting with the athletic director and Cullinan. The principal stated that "[t]he two main concerns during your terms as coach" were (1) "[d]evelopment of a team concept" and (2) "[c]reation of a less threatening environment for players." The memo continued:

> Upon review of all the facts and circumstances during your tenure as head coach, it is apparent that you have not rectified the concerns to a satisfactory level. Due to your inability to make sufficient progress in the before mentioned concerns, I am recommending to the superintendent that your basketball coaching contract not be renewed.

On April 28, 2004, based on the principal's recommendation of termination and his own investigation, the superintendent recommended termination of Cullinan's coaching contract for "[f]ail[ing] to effectively lead the program [and f]ail[ing] to adequately remediate leadership deficiencies in [the] program." A hearing at Cullinan's request was held in June and July 2004, and the board voted unanimously to terminate Cullinan's coaching contract. Additional facts will be discussed as we apply them in the disposition of the case.

## II. Rules for Review of Termination Decisions.

Review of a school board's termination of a teacher's contract is for correction of errors at law. *Walthart v. Bd. of Dirs.*, 694 N.W.2d 740, 744

(Iowa 2005). Under Iowa Code section 279.19A, the procedure for termination of coaching contracts is the same as for teachers' contracts. *See* Iowa Code § 279.16.

Section 279.18 provides that, "[i]n proceedings for judicial review of the adjudicator's decision, the court shall not hear any further evidence but shall hear the case upon the certified record." On judicial review,

> [t]he court may affirm the adjudicator's decision or remand to the adjudicator or the board for further proceedings upon conditions determined by the court. The court shall reverse, modify, or grant any other appropriate relief from the board decision or the adjudicator's decision . . . .

Iowa Code § 279.18. The statute does not state which decision is to be reviewed by the court—the adjudicator's or the board's. However, it is clear under our case law that we review the board's findings, not those of the adjudicator. *See Bd. of Educ. v. Youel*, 282 N.W.2d 677, 682 (Iowa 1979) ("Under the statutory scheme, the Board alone makes findings of fact . . . .").

A reviewing court must determine whether a school board's decision is supported by a preponderance of the competent evidence in the record. *Walthart*, 694 N.W.2d at 744. On review of the school board's decision, especially on issues of credibility, the court is obliged to give weight to the board's fact-findings, although it is not bound by them. Iowa Code § 279.18; *Walthart*, 694 N.W.2d at 745.

Termination of a teaching or coaching contract may only be for "just cause." Iowa Code § 279.15(2). The legislature has not defined just cause; however, we have stated:

> Probably no inflexible "just cause" definition we could devise would be adequate to measure the myriad of situations which may surface in future litigation. It is sufficient here to hold that in the context of teacher fault a "just cause" is one which directly or indirectly significantly

and adversely affects what must be the ultimate goal of every school system: high quality education for the district's students. It relates to job performance including leadership and role model effectiveness. It must include the concept that a school district is not married to mediocrity but may dismiss personnel who are neither performing high quality work nor improving in performance. On the other hand, "just cause" cannot include reasons which are arbitrary, unfair, or generated out of some petty vendetta.

*Briggs v. Bd. of Dirs.*, 282 N.W.2d 740, 743 (Iowa 1979).

In addition to these general principles for review of termination cases, two additional questions arise in this case. The first is what weight should be given to the hearsay evidence presented to the board, and the second is what should be the proper scope of the board's inquiry into just cause?

**A. Hearsay Evidence.** It is clear that hearsay evidence is admissible in teacher termination cases. *Walthart*, 694 N.W.2d at 744–45; *Fay v. Bd. of Dirs.*, 298 N.W.2d 345, 349 (Iowa Ct. App. 1980); Iowa Code § 279.16(4) ("The board shall not be bound by common law or statutory rules of evidence . . . ."). The question here is how much weight should be accorded such evidence, and that

will depend upon a myriad of factors—the circumstances of the case, the credibility of the witness, the credibility of the declarant, the circumstances in which the statement was made, the consistency of the statement with other corroborating evidence, and other factors as well.

*Walthart*, 694 N.W.2d at 744–45.

Using this multiple-factor test, we believe the hearsay evidence in this case bore sufficient indicia of reliability to be properly considered. The administrative reports and memoranda, while hearsay, had been drafted as part of the school administrators' official responsibilities. The parents' letters in the packet of May 10, 2002, were, in most cases, signed by the writers, and in all cases, the writers were identified in the

letters. The writers were therefore subject to being called for questioning by Cullinan if he had doubts about the accuracy of the letters or the parents' motivations for writing them. In addition, the basketball players themselves were all identified in the letters and subject, if Cullinan had desired, to be called as witnesses as well. The players' statements were made under circumstances that tended to establish credibility. *See id.* at 745 (indicia of reliability was shown by the fact the "statements were made by adolescent teens just days after the tragedy"). In *Walthart,* we credited this testimony by a counselor and found other indications of reliability:

> "My experience has been you get very, very accurate information when kids are vulnerable. All their defense mechanisms are down, and they just lay everything out there for you to work with." Second, these statements were often made in private to trusted officials (i.e., the guidance counselor and basketball coach), or to figures of authority (i.e., the superintendent and police officers). Third, the testimony from all of the hearsay witnesses seems consistent—they all recalled that, when asked if Carol Walthart knew of the student drinking, the majority of the students stated that she did.

*Id.* Similarly in this case, the players' statements were made by teenagers who were obviously distressed by the situation; they were made to trusted individuals, i.e., their parents; and they carried a consistent message—the players expressed the view that the coach was threatening and intimidating toward them.

We reject the argument that the board improperly considered the hearsay evidence. The termination statute and our cases make it clear that a board may consider such evidence in making its decision, and the evidence provided in this case bore sufficient indicia of reliability to be a part of the record.

**B. The Scope of the Board's Just-Cause Inquiry.** It is true that the December 16, 2003 hallway incident involving Alex Thompson and Cullinan, in which Cullinan allegedly violated the plan for remediation, was the spark that initiated the proceedings for termination. The parties, however, raise a question as to the scope of the board's just-cause inquiry: is it based exclusively on the events of December 16, as Cullinan appears to argue, or may the inquiry also include Cullinan's employment history predating December 16, as the board argues?

The adjudicator adopted a narrow scope of inquiry and limited the just-cause inquiry to the question of whether the December 16, 2003 incident violated the July 2002 remediation directive concerning one-on-one meetings. This is clear from his ruling in which he criticized the board for a "deliberate merging of the earlier incidents with the incident [on December 16], which triggered the termination at issue." The district court and the court of appeals appear to have adopted a narrow scope of inquiry as well and concluded that the December 16 incident was insufficient to constitute just cause.

We reject this narrow scope of the board's inquiry. While the board's termination order discussed the December 16 incident at length, its order made it clear that the termination was based on Cullinan's entire history with the district—not just the December 16 incident. The latter incident was, apparently, merely the proverbial straw that broke the camel's back. The superintendent listed two grounds for termination: "Failure to effectively lead the program [and] . . . [t]o adequately remediate leadership deficiencies in [the] program." The board concluded that both bases for termination had been established.

The attorney who conducted the hearing on behalf of the board rejected Cullinan's attempts to restrict the superintendent's evidence to

the December 16 incident. She correctly ruled that, because failure to remediate prior problems had been charged by the superintendent in his recommendation for termination, the board

> [had to go] back to see what happened in the past to indicate whether or not the employee had knowledge of what was expected. I do believe that even '98 as well as 2002 is relevant for showing that, and so I'm going to rule that it is relevant for the board to consider what had been told to the coach in prior years.

The board's evidence included Cullinan's entire employment history, and its decision was based on his failure to remediate prior problems as well as the events of December 16. The board's order of termination stated:

> The Board . . . finds that while the December 16, 2003, incident with Alex Thompson would have been a sufficient reason to terminate Coach Cullinan's coaching contract, *there was other sufficient evidence to terminate Coach Cullinan's contract.*

(Emphasis added.)

This broad scope of the just-cause inquiry is consistent with our case law. In *Sheldon Community School District Board of Directors v. Lundblad*, a teacher argued that the board could not consider incidents "long since resolved." 528 N.W.2d 593, 596 (Iowa 1995). We rejected that argument, stating:

> On the question of dredging up old records, it is inescapable that Lundblad's most recent run-ins with students and parents merely fit a pattern that has evolved over several years. The offensive remarks that led to his resignation as the girls' track coach in 1986 are not unlike the derogatory and suggestive comments suffered by the girls' basketball team in 1989 or the sarcastic student evaluations handed out in 1991 and 1992. In each case Lundblad assured district officials that he would do better in the future. Individually, the incidents may have been resolved satisfactorily. We do not believe the board, however, is compelled to ignore the pattern that emerges.

*Id.* at 596.

Similarly, in *Randall v. Allison-Bristow Community School District*, 528 N.W.2d 588 (Iowa 1995), the teacher was accused of physically grabbing a student in 1992. *Randall*, 528 N.W.2d at 590. Nine years earlier, in 1983, Randall had mishandled a student, resulting in a warning memorandum. Additional memoranda were issued for other incidents in 1987 and 1988, noting Randall's "continued failure to abide by the district's policies concerning supervision and/or physical handling of students." *Id.* In *Randall*, we did not limit our inquiry to the last incident (the one that actually triggered the superintendent's recommendation of termination), but viewed his entire disciplinary history, noting that the last incident was just "the last in a series." *Id.* We affirmed the termination, and in doing so, we did not even discuss whether the 1992 incident that triggered the termination proceeding was sufficient in itself to constitute just cause. It was not necessary to do so. In this case, as in *Randall*, a single event, which was "the last in a series," merely prompted the school administration to take action.

In this case, Cullinan cannot credibly argue that he was caught by surprise by the board's consideration of his entire coaching career at the Ames High School, rather than limiting it only to the December 16 hallway incident. He was informed throughout his career about the need for respect toward athletes. These principles were continuously emphasized in the coach's and parents' manuals, the administration's memoranda to Cullinan explaining the grounds for extending his probation, and numerous complaints from parents and students during his career. Further, Cullinan was notified by the superintendent that one of the grounds for termination was Cullinan's failure to remediate preexisting problems. We conclude the board appropriately considered

Cullinan's coaching history in deciding whether to terminate his coaching contract.

**C. The Board's Just-Cause Determination.** Cullinan asserts a number of arguments supporting his claim that the board did not have just cause to terminate his coaching contract, even considering his previous problems in the district. In order to determine whether the board's decision was justified by a preponderance of the evidence, we must address each of Cullinan's assertions, the board's evidence, and the holdings of the adjudicator and of reviewing courts.

First, Cullinan contends the December 16 hallway meeting with Alex Thompson was not sufficient just cause for termination. This contention is based, initially, on Cullinan's argument that the one-on-one meeting with Thompson did not violate any directive to which he was subject. Cullinan asserts that the prohibition against one-on-one meetings contained in the assistant superintendent's July 2 directive was not included in the remediation plan he drafted and to which he was subject. The board responds that Cullinan's remediation plan merely supplemented the July 2 directive, and thus, the provisions of both documents were in effect. We agree with the board that the administration's approval of Cullinan's remediation plan did not evidence an intent to allow one-on-one meetings between Cullinan and the student-athletes. Whether Cullinan's meeting with Thompson on December 16 qualified as a situation requiring the presence of another adult is another question.

The July 2 directive required

> acute individual student-athlete corrections . . . [to be] [d]one away from the group setting or directed to the group as a whole [or] [d]one in the presence of an assistant coach or in the presence of a student's counselor or parent.

The athletic director testified at the board hearing that he had discussed the meaning of this requirement with Cullinan, and Cullinan understood what it meant, i.e., that he must not have one-on-one meetings with his student-athletes. The board credited this evidence and rejected Cullinan's version of the matter, based on his demeanor at the hearing. Additionally, the board credited Thompson's testimony that the meeting was intimidating. We give deference to the board's credibility findings. The board in its ruling stated it "specifically finds" that the December 16 event was an "acute individual correction" in violation of the July 2 directive. Even if that were not so, the board concluded, the incident "was intimidating and in violation of his earlier multiple warnings."

We need not decide whether Cullinan violated the July 2 directive. Contrary to the decision of the adjudicator and the reviewing courts, our detailed analysis of the record in this case shows that Cullinan's termination did not rise or fall on whether the December 16 hallway incident violated the July 2 directive. Whether or not the December 16 incident was alone sufficient to constitute just cause, it was certainly enough to trigger the termination proceeding and open the door to the board's consideration of Cullinan's failure to remediate the problems that have followed him throughout his career in the Ames district. *See Randall*, 528 N.W.2d at 590.

Next, Cullinan attacks the board's reliance on the parents' complaints contained in the "Parents vs. Cullinan" packet. Cullinan argues these complaints lack merit because they are based on their sons' lack of playing time. He characterized the complaints as a parents' "conspiracy." The board rejected this argument, concluding that the parents' complaints about playing time, while considered, did not affect the termination decision. We agree with the board. First, Alex

Thompson's complaint, which triggered the termination process, had nothing to do with playing time. Thompson was, in fact, a starter on the basketball team and a college recruit. Further, an examination of the parents' complaint letters reveal that, while playing time was mentioned, their primary complaint involved Cullinan's demeanor toward students and the damage it was doing to the basketball program. Also, some of the letters were from parents whose sons had already graduated and were therefore not concerned with playing time. The parents of one former player stated:

> Kyle's experience on the Ames High basketball team remains perhaps the darkest point in his life and one which he finds difficult to talk about. The most significant thing he took away from it was a vow never to be put down again.
>
> . . . .
>
> To this day, we are amazed and saddened that this situation has been allowed to continue. . . . Now, in talking to parents of current players, we are further saddened in the knowledge that young people continued to suffer. After all of these years, still no one wants to listen to this despicable situation or do anything about it. We are ashamed that this could continue [to] happen in the Ames schools.

Other letters from parents of former players expressed the same complaints: intimidation, derogatory treatment, and profanity. Tim Taylor, the assistant superintendent and personnel director, testified that most of the parents' concerns

> reflect[] upon such things as intimidation, the use of profanity, effects upon student athletes' self-esteem, lack of team building and that there were concerns that the program was on shaky ground because kids were not having fun and not interested in coming out for basketball.

In response to the question of whether it was a playing-time issue, Taylor replied, "not at all." The superintendent pointed out that Cullinan's

failure to remediate the problems the administration had notified him of presented a significant concern. He testified:

> In my opinion this is repetitive behavior that began as early as 1998, and we've been dealing with it ever since. I believe another factor that comes into play was I actually was surprised to know too at how widespread the discontent amongst the parents of the athletes was at that time. It has continued. I'm also extremely concerned about whether or not the kids are really enjoying the basketball experience.

Further, the superintendent emphasized that the students themselves took the highly unusual step of meeting with the athletic director to express their concerns about a lack of excitement on the part of the players, which was attributed to Cullinan's coaching. This was the consensus of the administration's concerns expressed by two athletic directors, the principal, the assistant superintendent, and the superintendent. Clearly, the overriding concern of the parents and the administration was not playing time, but rather "what was happening to our students."

Cullinan also contends that Alex Thompson's complaints about the December 16 hallway incident were motivated by his desire to deflect attention from an incident at the winter formal involving Thompson's date's consumption of alcohol. The board found that Thompson reported the December 16 incident to the administration well before the winter formal, and the two incidents were not connected. We agree. There is simply no evidence in the record suggesting Thompson would lodge a complaint against his coach merely to create a diversion.

When we consider the entire record, we conclude the superintendent established just cause by a preponderance of the competent evidence.

The adjudicator (but not the reviewing courts) also reversed the board's order on the ground it was "unreasonable and a clearly unwarranted exercise of discretion." Because we have concluded that the termination was proper on just-cause grounds, it follows that the decision was not invalid as unreasonable or an abuse of the board's discretion. *See DeShon v. Bettendorf Cmty. Sch. Dist.*, 284 N.W.2d 329, 332 (Iowa 1979) ("As we find just cause for termination, it follows that the nonrenewal of petitioner's contract was not arbitrary or an abuse of discretion.").

We vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for a district court order affirming the decision of the board.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED.**