# IN THE COURT OF APPEALS OF IOWA

No. 20-1540
Filed December 15, 2021

JULIE ANN FISCHER,
        Plaintiff-Appellant,

vs.

SIOUX CITY COMMUNITY SCHOOL DISTRICT AND BOARD OF DIRECTORS,
RONALD COLLING, JACKIE WARNSTADT, MIYUKI NELSON, and DR.
MICHAEL McTAGGART II,
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Woodbury County, Steven J.

Andreasen, Judge.


        Julie Fischer appeals a school district's termination of her employment

contract.  **AFFIRMED**.


        David L. Reinschmidt of Munger, Reinschmidt & Denne, LLP, Sioux City,

for appellant.

        Timothy A. Clausen of Klass Law Firm, L.L.P., Sioux City, for appellee.


        Heard by Vaitheswaran, P.J., and Tabor and May, JJ.

**MAY, Judge.**

The Sioux City Community School District (District) board of directors (Board) terminated Julie Fischer's teaching contract. Fischer sought judicial review under Iowa Code section 279.18 (2019). The district court affirmed the Board. Fischer appeals. We affirm.

**I. Facts and Prior Proceedings**

On Monday, June 18, 2018, several district employees (recipients) received anonymous letters at their homes.[1] The letters were postmarked June 15. Their contents varied. Some were "articles" about teachers bullying other teachers. Another was a poem entitled "The rotten teacher who didn't know . . ." Some included profanity. Others included sarcastic memes. All of the letters were negative. For instance, one letter said: "Your time is coming ............... You lying SOB."

The recipients contacted local law enforcement to file harassment complaints.[2] They also reached out to District human resources director Rita Vanatta, who began her own internal investigation. Although the letters were anonymous, the recipients all thought the letters had been sent by a fellow District employee, Fischer, who taught at West Middle School.

---

[1] These employees were: Jennifer Pottoroff, Laura Stokes, Seth Sackman, Cindy Joffer, Katherine (Katie) Towler, Kimberly Buryanek, and Paul Guasman. At the time, Pottorff, Stokes, Sackman, and Joffer were teachers at West Middle School in the District; and Towler was the outgoing principal there. Guasman was the superintendent, and Buryanek was the associate superintendent of the District.

[2] One of the recipients, Joffer, received the letter at her home in Union County, South Dakota. Everyone else lived in Woodbury County, Iowa, and made reports to the Sioux City Police Department.

Both the Sioux City Police Department and the District contacted the Sioux City post office. Because the stamps on the letters contained QR codes, a postal inspector was able to provide information about the stamps' origin. The information included a photo of the person who bought the stamps, whom the investigating officer recognized as Fischer. The stamps were purchased on June 15, the same day the letters were postmarked.[3]

When the investigating officer contacted Fischer to discuss the matter, Fischer initially denied knowing about the letters. But when the officer mentioned "harassing letters," Fischer became defensive and ended the call. Eventually, Fischer was charged with six counts of harassment in Iowa and one count of stalking in South Dakota. Fischer filed motions to dismiss in both states. In South Dakota, the prosecution dismissed the stalking charge. In Iowa, the district court granted Fischer's motion.

After the criminal charges were resolved, the District's investigation continued. Vanatta interviewed Fischer in the presence of Fischer's lawyer. Fischer denied mailing the letters. And Fischer claimed she had no knowledge of the letters until her lawyer presented them to her. Fischer also claimed that, although she may have purchased the stamps, she typically leaves stamps at her office in West Middle School and at her private real estate business. Fischer claimed anyone at either location could have grabbed them off her desk.

Once the district's internal investigation was complete, Superintendent Gausman presented Fischer with a document entitled "Notice and

---

[3] We are referring to the letters received on June 18. Additional letters were also received on July 11 and July 12.

Recommendation to Terminate Contract" (Notice). As its title suggests, the Notice announced that the superintendent was recommending that the Board terminate Fischer's "employment and continuing contract." In thirteen numbered paragraphs, the Notice stated various reasons for the superintendent's recommendation. As examples: paragraph one alleged Fischer sent the anonymous letters; paragraph five alleged Fischer violated District policies on harassment; and paragraph eleven alleged Fischer violated District policy regarding full cooperation "in workplace investigations when [she] made untrue statements and/or provided information that was dishonest, misleading, inaccurate, or incomplete during the course of an investigation."

Following an evidentiary hearing, the Board voted to accept the superintendent's recommendation and terminate Fischer's contract. The Board explained its reasoning in a detailed twenty-six-page decision. Here is a brief excerpt:

> Specifically, the Board finds just cause as outlined in Paragraph 11 of the [Notice]. [The Board] does so based on a finding that . . . Fischer was not credible in her testimony, and that she either: 1) wrote, or 2) sent or, 3) knows who sent, the letters at issue . . . .with stamps purchased by . . . Fischer affixed thereto. The Board further finds that . . . Fischer failed to cooperate in the District's investigation by making untrue statements and/or providing information that was dishonest, misleading, inaccurate, or incomplete, during the course of an investigation, when she denied writing the letters, mailing the letters or having any knowledge about them until [they were] presented to her by her attorney.

(Record citations omitted.)

Fischer sought judicial review under section 279.18. The district court affirmed the Board's decision. This appeal followed.

**II. Standard of Review**

We review a school board's termination of a teacher's contract for correction of errors at law. *Bd. Of Dirs. v. Cullinan*, 745 N.W.2d 487, 493 (Iowa 2008). We review the findings of the school board and not the reviewing district court. *See* Iowa Code § 279.18(2); *Bd. of Educ. v. Youel*, 282 N.W.2d 677, 682 (Iowa 1979) ("Under the statutory scheme, the Board alone makes findings of fact, and it is those findings which must be supported by a preponderance of [competent record evidence].") We give weight to the board's factual findings. Iowa Code § 279.18(2); *Bd. of Dirs. v. Davies*, 489 N.W.2d 19, 23 (Iowa 1992).

For constitutional issues, our review is de novo. *Venckus v. Iowa City*, 930 N.W.2d 792, 798 (Iowa 2019); *see also Mumford v. Godfried*, 52 F.3d 756, 759 (8th Cir. 1995).

**III. Discussion**

On appeal, Fischer advances three main arguments. First, Fischer claims the Board's decision to terminate was not supported by a preponderance of competent evidence and, moreover, was tainted by errors of law. Alternatively, Fischer claims the Board erred by not considering a lesser sanction. Finally, Fischer argues that—even if she sent the letters—the Board could impose no sanction because the letters were protected speech under the First Amendment to the United States Constitution. We address each argument in turn.

**A. Sufficiency of the evidence and related errors of law**

*1. Governing principles*

In Iowa, a school board may only terminate a teaching contract for "just cause." Iowa Code § 279.15(2)(a); *but see id.* § 279.19 (providing different

procedures for teachers during probationary periods). The legislature has not defined "just cause." Our supreme court has stated:

> Probably no inflexible "just cause" definition we could devise would be adequate to measure the myriad of situations which may surface in future litigation. It is sufficient here to hold that in the context of teacher fault a "just cause" is one which directly or indirectly significantly and adversely affects what must be the ultimate goal of every school system: high quality education for the district's students. It relates to job performance including leadership and role model effectiveness. It must include the concept that a school district is not married to mediocrity but may dismiss personnel who are neither performing high quality work nor improving in performance. On the other hand, "just cause" cannot include reasons which are arbitrary, unfair, or generated out of some petty vendetta.

*Briggs v. Bd. of Dirs.*, 282 N.W.2d 740, 743 (Iowa 1979).

"As in virtually every teacher termination case," our task here is to determine "whether the record supports the board's conclusion that just cause exists to warrant [the] dismissal." *Bd. of Dirs. v. Lundblad*, 528 N.W.2d 593, 596 (Iowa 1995). Under section 279.18(2)(f), we shall reverse the termination if Fisher's "substantial rights . . . have been prejudiced because" the Board's just-cause finding was "[u]nsupported by a preponderance of the competent evidence in the record made before the board when that record is viewed as a whole."[4] The finding "must be supported by more than just *substantial* evidence; a *preponderance*—or greater weight—of the competent proof is required." *Walthart v. Bd. of Dirs.*, 694 N.W.2d 740, 744 (Iowa 2005) (citation omitted).

Fischer's central argument is that—in light of this elevated standard— sufficient evidence did not support the Board's just-cause finding. Fischer also

---

[4] Additional grounds for reversal are set forth in paragraphs (a) through (e) and (g).

makes a related but slightly different argument, namely, that the Board made legal errors by relying on or giving improper weight to certain evidence. Fischer relies on section 279.18(2)(e), which requires us to reverse if Fisher's "substantial rights . . . have been prejudiced because" the Board's decision was "[a]ffected by" an "error of law." We consider all of Fischer's arguments below.

### 2. Analysis

As explained, the Board found there was just cause to terminate because Fischer violated District policy requiring full cooperation "in workplace investigations when [she] made untrue statements and/or provided information that was dishonest, misleading, inaccurate, or incomplete during the course of an investigation." More specifically, the Board found Fischer was dishonest when she denied writing, sending, or knowing who sent the anonymous letters. Fischer contends insufficient evidence supports these findings. We disagree. To begin, strong evidence connects Fischer with the letters. For example:

- Video evidence shows Fischer purchased a set of USPS stamps at 11:23 a.m. on June 15, 2018.

- Those same stamps were used on anonymous letters received by the recipients and postmarked June 15.

- Because the letters were postmarked June 15, there was a small window of time between (1) Fischer's purchase of the stamps at 11:23 a.m. and (2) the latest time that the letters could have been placed in the mail system. The window was somewhere between three hours and about five and one-half hours. This narrow window of opportunity made it highly improbable

that anyone except Fischer—or someone acting on Fischer's behalf—could have mailed the June 15 letters.

- The content of the letters was consistent with Fischer's prior communications. For example, one of the letters suggested that a teacher had received preferential treatment because of a preexisting relationship with then-principal Towler. That same complaint about staff favoritism appeared in an email Fischer sent to administrator Jim Vanderloo.

This and other evidence showed—by at least a preponderance of competent evidence—that Fischer sent, wrote, or (at least) knew who sent the letters. Yet, through the entire hearing process, Fischer denied that she sent or wrote the letters. Nor did she explain how the stamps she purchased became affixed to the letters. So we readily conclude that adequate evidence supports the Board's finding that Fischer violated District policy by failing to cooperate with the Board's investigation. Likewise, we readily conclude there was just cause for her termination.

### 3. Fischer's counterarguments

Fischer responds with a number of counter-arguments. We address each in turn.

### a. Lack of connection with recipients

Fischer claims that because she had no connection with the recipients, she had no motive to send them letters. Therefore, Fischer suggests, the Board was wrong to conclude Fischer probably did send the letters. We disagree.

At the outset, we note the Board was not required to prove Fischer's motive. Even if the evidence only showed that Fischer actually sent the letters (as it does)

but gave no indication of her reasons, the Board could still reasonably conclude Fischer sent the letters.

Moreover, we believe the record shows Fischer's connection with the recipients and some insights into why Fischer sent the letters. For starters, all of the recipients were employees of the District, and many worked with Fischer at West Middle School. Plus, Fischer's brother worked with several of the recipient teachers. And, Fischer testified, when some of those teachers had allegedly mistreated her brother, Fischer "had him file a bully report against [them]." But that complaint—which was handled by another recipient, Towler—was deemed unfounded and went nowhere. In fact, Fischer had frequent run-ins with Towler, who became principal of West Middle School. The year prior, Towler had been responsible for delivering the news that Fischer's long-time job of stand-alone reading teacher was being eliminated. This began an acrimonious relationship. Fischer described Towler as "incompetent." And Fischer was unhappy with Towler's handling of the bullying complaint.

Fischer also had frequent disagreements with recipient Sackman, a fellow West Middle School teacher. They parted ways over curriculum choices, teaching style, and more. Sackman—along with three other recipients—had applied to use "Future Ready" curriculum. One of the anonymous letters mocked this curriculum choice as "#FUTUREUNREADY."

All things considered, we think the record supports the Board's finding that Fischer had developed "an animosity against the recipients of the letters that her sending them to these individuals was consistent therewith." And by way of conscious repetition: even if Fischer's motives were not as plainly discernible as

the Board found them to be, the record as a whole still provides ample evidence that Fischer actually sent the letters or, at the very least, knew who sent them. We reject Fischer's contrary views.

### b. Personality

Along similar lines, we reject Fischer's contention that—because she is outspoken and confrontational—she would not have used anonymous letters to indirectly harass her colleagues. As the finder of fact, it was up to the Board to accept or reject this theory of Fischer's personality. And the Board had good reasons to reject it: Fischer had previously used email to complain about colleagues behind their backs rather than confronting them directly. And again, even if the Board had a limited or flawed understanding of Fischer's personality, there was still ample evidence that Fischer actually sent the letters or, at least, knew who sent them.

### c. Fischer's interest in the outcome

Fischer also argues the Board erred by discounting her testimony as self-serving, that is, because she was defending her job. But the school board did not categorically reject Fischer's testimony solely because she sought to keep her employment. Instead, as the Board's findings made clear, Fischer's interest in the outcome was merely one of several factors the Board weighed in assessing credibility. We see no error in this approach. *See Bd. of Dirs. v. Newell*, No. 04-0520, 2005 WL 974722, at *2 (Iowa Ct. App. Apr. 28, 2005) ("The court shall give weight to the fact findings of the Board, especially concerning the credibility of witnesses, but shall not be bound by them.").

*d. Demeanor*

Fischer also criticizes the Board's reliance on "demeanor" evidence. In its findings of fact, the Board listed several reasons for discounting Fischer's testimony. Fischer's demeanor was one of those reasons. "During testimony," the Board noted:

> Fischer avoided direct eye contact with anyone including the questioner and even her own attorney. [She] either looked down or up while answering questions. She even failed to make eye contact with Board Director McTaggert when describing a 1998 positive reference letter he wrote on her behalf . . . when he was a principal at West High School. [She] was fidgety and obviously uncomfortable in testifying. She was evasive in answering questions, including questions from her own attorney. The tone and inflections in her voice demonstrated conduct that was inconsistent with her testimony. When not fidgeting, she kept her arms folded in front of her in a defensive manner. The Board having observed . . . Fischer's appearance and demeanor finds she was not credible.

Fischer argues the Board's "extensive reliance on demeanor evidence [was] erroneous." As support, Fischer cites secondary sources that suggest demeanor evidence is inherently unreliable.

Iowa law takes a different view. Indeed, "[i]t is well settled that a factfinder may 'take into account the conduct and appearance of the witness on the witness stand' in determining the facts." *Ruden v. Peach*, 904 N.W.2d 410, 413 (Iowa Ct. App. 2017) (citation omitted). "A witness's demeanor while testifying—as perceived through the witness's 'carriage, behavior, bearing, manner and appearance'—is part of the evidence, and factfinders 'may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness.'" *Id.* (citation omitted). While these principles are often discussed in the context of jurors and judges, they apply equally to school boards

making termination decisions. *See Libe v. Bd. of Dirs.*, 350 N.W.2d 748, 750 (Iowa Ct. App. 1984) ("The board was in a far superior position to determine . . . credibility than is this court."). We find no error in the Board's use of demeanor evidence here.

### e. Hearsay

Fischer also complains about "double standards" in how the Board dealt with competing hearsay evidence. Vanatta and Roxanne Hutchinson, coworker of Fischer's at West Middle School, each testified about things they had learned concerning when and where letters are postmarked by the USPS. Vanatta's testimony suggested that, in light of the letters' June 15 postmark, there was only about a three-hour window between Fischer's purchase of the stamps (at 11:23 a.m.) and the latest time that the stamped envelopes could have been deposited with the USPS (2:15 p.m.). Conversely, Hutchinson's testimony suggested there could have been around five and one-half hours between purchase (11:23 a.m.) and drop off (5:00 p.m.).

Fischer notes that both witnesses' testimony was hearsay: they both testified about what they learned from others. Fischer criticizes the Board for relying on Vanatta's timeline while discounting Hutchinson's testimony as "hearsay" and "less credible." Fischer claims this amounts to an unfair double-standard.

At the outset, we note that school boards sitting for teacher-dismissal hearings are not bound by the rules of evidence. Iowa Code § 279.16(3). So, "[i]t is clear that hearsay evidence is admissible in teacher termination cases." *Cullinan*, 745 N.W.2d at 494. Instead, it's all a question of how much weight the

hearsay evidence should be given. *See id.* That depends on "a myriad of factors," including witness and declarant credibility, the circumstances of the statement, and the consistency of the statement with other corroborating evidence. *Walthart*, 694 N.W.2d at 744–45.

Applying these factors here, we see no error in the Board's reliance on Vanatta's testimony. *See Cullinan*, 745 N.W.2d at 494. For one thing, Vanatta's testimony was supported by corroborating evidence obtained from the post office website. Nor do we find error in the Board's conclusion that Vanatta's testimony was more reliable than Hutchinson's. When testimony conflicts, it is the Board's function to decide what testimony—if any—to believe. And, again, Vanatta's version was corroborated by documentary evidence.

Finally, although the Board thought Vanatta's version was more credible than Hutchinson's, the Board effectively gave weight to both versions. The Board expressly concluded: "[T]he finding supported by the undisputed evidence is that the window between . . . Fischer's stamp purchase and the time in which those stamps had to be affixed to the letters was just under 3 hours *to 5 1/2 hours.*" (Emphasis added.) And the Board relied on that broader "window"[5]—or *range* of possible "windows"—when it decided that Fischer wrote, sent, or knew who sent the letters. So even if the Board erred, no prejudice resulted.

---

[5] The Board's decision sometimes refers to "up to 5 hours" rather than five and one-half hours. We think this was a scrivener's error. In any event, it is harmless.

*f. Fifth Amendment*

Finally, Fischer notes that, in its written opinion, the Board mentioned Fischer's decision not to speak with law enforcement. From this, Fischer infers that her termination violated the Fifth Amendment.

We acknowledge that public school boards "may not penalize an individual by taking away his or her government employment . . . in direct response to the individual's assertion of Fifth Amendment rights." *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 518 (Iowa 2011) (citations omitted). But that is not what happened here. The Board did not terminate Fischer "in direct response to" Fischer's refusal to speak with police officers. Rather, the Board terminated Fischer "in direct response to" Fischer's "fail[ure] to cooperate in the District's investigation by making untrue statements and/or providing information that was dishonest, misleading, inaccurate, or incomplete . . . when she denied writing the letters, mailing the letters or having any knowledge about them until" the letters were "presented to her by her attorney." So we conclude Fischer's Fifth Amendment rights were not violated.

**B. Lesser sanction**

Fischer also argues that—even assuming Fischer sent the letters and then failed to come clean during the Board's investigation—the decision to terminate was not supported by just cause. Rather, Fischer suggests, a lesser sanction was more appropriate in light of her long career as an educator, which included positive job reviews through 2016.

The totality of Fischer's employment history—including the positive elements—was relevant to the just cause determination. *See Bd. of Dirs. v.*

*Sexton*, 334 N.W.2d 341, 343–44 (Iowa Ct. App. 1983). But the question before the Board—and before us—is whether there was just cause for termination at the time of the 2019 school board hearings.

We think there was. The Board found that, around 2016, something changed in Fischer's attitude towards her coworkers and the District. Fischer strongly disliked her workplace. And Fischer's animosity towards coworkers and administration was well-documented.

Moreover, even if Fischer had been an ideal employee in other respects, the Board was not required to overlook the serious nature of Fischer's failure to cooperate with the investigation, including and especially Fischer's persistent dishonesty about her connection to the letters. The Board found that retaining Fischer "as a teacher would render" the District's mandatory cooperation policy "meaningless." We cannot say that this finding was unreasonable. In other contexts, we have said: "Termination, while harsh, is appropriate discipline for dishonesty in an internal investigation." *Hyatt v. Marion Civ. Serv. Comm'n*, No. 20-1023, 2021 WL 3075732, at *5 (Iowa Ct. App. July 21, 2021) (quoting *Milligan v. Ottumwa Civ. Serv. Comm'n*, No. 18-1810, 2019 WL 5792655, at *8 (Iowa Ct. App. Nov. 6, 2019)). We think the same applies here.

Viewing the totality of the record, the Board's finding of just cause for termination was supported by a preponderance of competent evidence. The Board was not obligated to forgo termination in favor of a lesser sanction.

### C. First Amendment

Lastly, Fischer argues that the termination violates her First Amendment rights because—assuming Fischer did write or send the letters—the letters'

content was protected speech. The Board responds that Fischer's constitutional claim is inconsequential because she was ultimately terminated for failure to cooperate with the school investigation, not for the letters' content. In the alternative, the Board claims Fischer cannot make out a valid constitutional claim on the merits.

At the outset, we do not believe the District's reasons for the termination automatically foreclose constitutional scrutiny. While the Board ultimately based its decision to terminate Fischer on her non-compliance with the cooperation policy, that finding was predicated on the Board's finding that Fischer wrote, sent, or knew who sent the letters. And if the letters had been anonymous but innocuous, we doubt there would have been an investigation at all. In other words, the content of the letters mattered. So we do not assume the First Amendment is automatically irrelevant.

Moreover, the parties agree that Fischer may not be forced to relinquish her First Amendment rights at work just because she is a public employee. *See Pickering v. Board of Ed.*, 391 U.S. 563, 568 (1968). Under the *Pickering* framework, we consider the balance between the employee's First Amendment right to speak on matters of public concern and the public employer's interest in "promoting the efficiency of the public services it performs through its employees." *Id.*

But before we reach the *Pickering* framework, we must "ensure that the employee and the employer each has an interest to balance." *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 832–33 (8th Cir. 2015). As for the employee, we must ask whether Fischer "spoke as a citizen on a matter of public

concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If not, Fischer has no First Amendment remedy. *Anzaldua*, 793 F.3d at 833. And not every statement that a public employee makes about their job addresses a matter of public concern. *Belk v. City of Eldon*, 228 F.3d 872, 879 (8th Cir. 2000). Indeed, "[w]hen a public employee's speech is purely job related, that speech will not be deemed a matter of public concern." *Buazard v. Meridith*, 172 F.3d 546, 548 (8th Cir. 1999). "Unless the employee is speaking as a concerned citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment." *Id.*

Based on the "content, form, and context" of the letters, we agree with the district court that the speech involved here is "purely job related" and not protected speech. *See id.* As for "form" and "context," this case involves private letters to specific individuals. The recipients were all employed by the District; so they were Fischer's fellow employees. And all of letters were sent to the recipients' homes; none of the letters were sent to an editorial board or any other public forum. All of this suggests that the letters were communications by Fischer "as an employee" with fellow employees. *See id.* None of this suggests Fischer was addressing the public "as a concerned citizen." *See id.*

As for the letters' content, we acknowledge Fischer's point that "the behavior and quality of teachers and administrators in public schools" always has *some* implications for the public. As explained, though, even when a public employee speaks about the operation of a public entity, the speech will not fall "under the protection of the First Amendment" unless "the employee is speaking as a concerned citizen, and not just as an employee." *Id.* And the content of these letters does not suggest Fischer was speaking as a "concerned citizen." Rather,

like the district court, we believe the letters were primarily an employee's complaints about their colleagues. The letters provide little information "other than the fact that a single employee is upset with the status quo." *Connick v. Meyers*, 461 U.S. 138, 148 (1983); *accord Bailey v. Dep't of Elementary and Secondary Educ.*, 451 F.3d 514, 520 (8th Cir. 2006) (holding letter from employee to supervisor did not touch upon matters of public concern because it primarily involved personal conflicts between supervisor and employee); *see also Anzaldua*, 793 F.3d at 833 (holding complaints singling out supervisor with whom employee already had a "strained relationship" did not implicate matters of public concern); *Tuttle v. Missouri Dep't of Agric.*, 172 F.3d 1025, 1034 (8th Cir. 1999) (holding conversations about "salaries, promotions, [and] safety issues" were not protected speech where the speaker "was speaking out as an employee, not as a concerned citizen").

In light of the letters' content, form, and context, we conclude they were not protected speech for First Amendment purposes. So we need not proceed further. *Anzaldua*, 793 F.3d at 833 (holding that if speech does not relate to a matter of public concern, "the employee has no First Amendment cause of action based on [their] employer's reaction to the speech" (citation omitted)).

## IV. Conclusion

We conclude (1) the Board's decision to terminate was supported by a preponderance of competent evidence, (2) the Board's decision was not tainted by prejudicial errors of law, (3) the Board was not obligated to impose a lesser sanction, and (4) the First Amendment did not preclude termination. We affirm.

**AFFIRMED.**