Carol WALTHART, Appellant,

v.

**BOARD OF DIRECTORS OF EDGE-
WOOD–COLESBURG COMMUNITY
SCHOOL DISTRICT, Appellee.**

No. 04–0177.

Supreme Court of Iowa.

April 8, 2005.

See also 667 N.W.2d 873.

William R. Unger, Des Moines, for appellant.

Brian L. Gruhn of Gruhn Law Firm, P.C., Cedar Rapids, for appellee.

LARSON, Justice.

Carol Walthart had been a teacher for eighteen years in the Edgewood–Colesburg Community School District (EDCO) when the school board terminated her contract under Iowa Code chapter 279 (1999). Following her appeal to an adjudicator, the district court upheld the termination, and she appealed. We affirm.

## I. *Facts and Prior Proceedings.*

In September 2000 students from the EDCO school district gathered in a hay field on property owned by Carol Walthart and her husband, Dennis. The Waltharts' son, Mark (a senior at EDCO), was there, and he and several other students were drinking alcohol. Late that night, the beer ran out, so four students left by car to buy more. On their way to town, the driver lost control and hit a tree, killing all four of the students. Investigation later determined that the driver had an alcohol blood level of .380, more than three times the legal limit. In October 2000 the EDCO superintendent gave Walthart written notice under Iowa Code section 279.15 that he was recommending her contract with the school district be terminated, prior to the end of the current contract year, for just cause. *See* Iowa Code § 279.27. He gave the following reasons:

- Unprofessional conduct in allowing students to use teacher's property for a party where alcohol was illegally used by students.

- Failure to effectively monitor a party on teacher's property wherein student

alcohol consumption contributed to the death of several students.

- Failure to protect the safety and welfare of students.
- Inability to be effective as a teacher.
- Poor role model.
- Poor and ineffective leadership.

Walthart requested a private hearing under Iowa Code sections 279.15 and .16, and the board held the hearing on November 3 and 4, 2000. The board's deliberation continued at a special session on November 13, 2000. At the close of that meeting, a roll call vote was taken, and the board voted unanimously to terminate Walthart's contract.

Following the board's vote to terminate her, Walthart filed a notice of appeal to an adjudicator under Iowa Code section 279.17. She claimed the termination violated statutory and constitutional provisions; was in excess of the statutory authority of the board; violated board rules, policies, and contracts; was made under unlawful procedures; was affected by errors of law; was unsupported by a preponderance of competent evidence; and was unreasonable, arbitrary, capricious, and an abuse of discretion.

Walthart also filed a certiorari action to assert matters she contended could not effectively be raised in a statutory appeal under chapter 279. The district court considered her certiorari arguments and concluded they were without merit. Walthart appealed to this court, which found that certiorari was not a proper remedy under the circumstances. *Walthart v. Bd. of Dirs.*, 667 N.W.2d 873, 875 (Iowa 2003) [hereinafter *Walthart I*]. We explained that, because Walthart had filed an appeal with an adjudicator, the board's decision was not yet final. *Id.* at 876. Further, we held that the appeal to the adjudicator under section 279.17 was her exclusive remedy. *Id.* at 878. We affirmed the

district court's decision to annul the writ of certiorari.

Walthart then resumed her appeal to the adjudicator. The adjudicator concluded that the board's finding of just cause to terminate was unsupported by a preponderance of the competent evidence and reversed the board's decision. The board appealed that decision to the district court pursuant to Iowa Code section 279.18. The district court reversed the adjudicator's decision and affirmed the board's decision to terminate.

## II. *The Issues.*

Walthart raises five issues on appeal, but three of them may be subsumed into her two main arguments: (1) the district court erred by refusing to consider evidence outside the record as certified by the board, and (2) the board's decision to terminate her was "[u]nsupported by a preponderance of the competent evidence in the record" under Iowa Code section 279.18(6).

## III. *The Scope of the Record in District Court.*

■ In Walthart's certiorari action against the school district, rejected in *Walthart I*, she made a record of alleged irregularities in the board's proceedings to terminate her. Specifically, she claimed that much of her case was

> based on events bearing on the board's decision that occurred outside the formal hearing, such as the alleged involvement by the board's attorney in the decision-making process.

*Walthart I*, 667 N.W.2d at 876.

In this case, Walthart attempted to get the record of the certiorari case admitted in district court because it included matters outside the record as certified by the board. This additional record would have

included the extraneous acts by board members and their attorney, which allegedly had impacted the board's decision. Iowa Code section 279.17 limits the evidence that may be considered by the adjudicator.

Within thirty days after filing the notice of appeal [to the adjudicator], or within further time allowed by the adjudicator, the board shall transmit to the adjudicator the original or a certified copy of the entire record of the private hearing which may be the subject of the petition. . . .

*The record certified and filed by the board shall be the record upon which the appeal shall be heard* and no additional evidence shall be heard by the adjudicator.[1]

(Emphasis added.)

A district court on judicial review of the adjudicator's ruling is also limited as to the evidence it may consider. Iowa Code § 279.18 ("In proceedings for judicial review of the adjudicator's decision, the court shall not hear any further evidence but shall hear the case upon the certified record."). This limited scope of the record in teacher-termination cases must be contrasted to that in other cases involving judicial review of agency action. *See* Iowa Code § 17A.19(7) ("In proceedings for judicial review of agency action a court may hear and consider such evidence as it deems appropriate.").

We believe the legislature's decision to limit the record on judicial review in teacher-termination cases was deliberate; a terminated teacher has an opportunity to expand the certified record by applying to the adjudicator under Iowa Code section 279.17:

Before the date set for hearing a petition for review of board action . . ., application may be made to the adjudicator for leave to present evidence in addition to that found in the record of the case. If it is shown to the adjudicator that the additional evidence is material and that there were good reasons for failure to present it in the private hearing before the board, the adjudicator may order that the additional evidence be taken before the board upon conditions determined by the adjudicator. The board may modify its findings and decision in the case by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions, with the adjudicator and mail copies of the new findings or decisions to the teacher.

We agree that a terminated teacher must have a means of challenging the board's decision with evidence of matters outside the certified record, but we do not agree that it should be done by a district court on judicial review in light of section 279.18, which clearly prohibits it.

■ The only vehicle for getting outside evidence into the certified record of the board is through an application to the adjudicator requesting that the adjudicator order the board to consider the evidence. *Id.* § 279.17. Walthart initially made an application to do this, but she withdrew it before the adjudicator ruled on it. In doing so, she lost her only means of supplementing the record, and the district court did not err in rejecting her proffer of the additional evidence.

## IV. *Sufficiency of the Evidence.*

Walthart contends that the board's factual finding that she knew students were

---

1. As discussed later, additional evidence may be ordered by the adjudicator to be submitted to the board, but the evidence that may be considered by the adjudicator is clearly limited to the certified record furnished by the board.

consuming alcohol at the party is not supported by a preponderance of the competent evidence in the record.

**A.** *Standard of review.* "On review, courts must determine whether a school board's decision is supported by a preponderance of the competent evidence in the record.... The court is limited on review to the record made before a school board." *Bd. of Dirs. v. Banke,* 498 N.W.2d 697, 701 (Iowa 1993). Review is "for the correction of errors at law." *Sheldon Cmty. Sch. Dist. Bd. of Dirs. v. Lundblad,* 528 N.W.2d 593, 596 (Iowa 1995).

**B.** *Preponderance of the credible evidence.* "As in virtually every termination case, the controversy boils down to whether the record supports the board's conclusion that just cause exists to warrant [a teacher's] dismissal. That conclusion must be supported by more than just *substantial evidence; a preponderance*—or greater weight—of the competent proof is required." *Id.; cf. Briggs v. Bd. of Dirs.,* 282 N.W.2d 740, 744 (Iowa 1979).

The distinction between these two standards may be understood by considering the statutes and our cases explaining them.

"Substantial evidence" means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

Iowa Code § 17A.19(10)(f)(1) (2003); *accord Mosher v. Dep't of Inspections & Appeals,* 671 N.W.2d 501, 508 (Iowa 2003). Thus, "[a]n agency's decision does not lack substantial evidence because inconsistent conclusions may be drawn from the same evidence." *Mosher,* 671 N.W.2d at 508 (internal quotations omitted).

On the other hand, a "preponderance"

means superiority in weight, influence, or force. The evidence may preponderate, and yet leave the mind in doubt as to the very truth. In such cases the evidence does not fairly set the question at rest, but merely preponderates in favor of that side whereon the doubts have less weight.

*Ball v. Marquis,* 92 N.W. 691, 692 (Iowa 1902) (not published in Iowa Reports). Thus, when reviewing a board's decision to terminate, the court's "task is to examine the record and determine whether the board's factual findings are supported by a preponderance of the evidence offered." *Bd. of Dirs. v. Justmann,* 476 N.W.2d 335, 338 (Iowa 1991). That is the test we apply here.

**C.** *Hearsay and witness credibility.* In resolving the issue of the sufficiency of the evidence, two preliminary issues arise. The first relates to hearsay evidence and the second to the board's determination of witness credibility.

**1.** *Hearsay.* Hearsay is admissible in board hearings. Iowa Code § 279.16 (1999) ("The board shall not be bound by common law or statutory rules of evidence ...."); *accord Justmann,* 476 N.W.2d at 337 (referring to hearsay evidence submitted at the board termination hearing); *Fay v. Bd. of Dirs.,* 298 N.W.2d 345, 349 (Iowa Ct.App.1980) (explaining that hearsay testimony is clearly admissible in teacher-termination hearings). The more pertinent question is how much weight should the board or reviewing court accord hearsay testimony.

We believe that the proper weight to be given to hearsay evidence in such a hearing will depend upon a myriad of factors—the circumstances of the case, the

credibility of the witness, the credibility of the declarant, the circumstances in which the statement was made, the consistency of the statement with other corroborating evidence, and other factors as well.

In this case, the board heard several witnesses whose testimony was based largely on hearsay. This testimony included that of the school superintendent, several peace officers, the school guidance counselor, and a basketball coach/science teacher.

The adjudicator found that the board relied too heavily on hearsay testimony, stating that "Iowa law requires that such hearsay evidence may not be relied upon, without further support in the record, to establish the truth of the matter asserted." We disagree with the adjudicator's characterization of the evidence. At least two of the students who attended the party testified that they believed Carol Walthart knew the students were drinking alcohol. The hearsay testimony was not the only basis for the board's decision; to the contrary, it was corroborative in nature and supported the students' testimony.

Additionally, we believe the hearsay testimony in this case bore sufficient indicia of reliability. First, the statements were made by adolescent teens just days after the tragedy. As David Malausky, the school guidance counselor, testified, "My experience has been you get very, very accurate information when kids are vulnerable. All their defense mechanisms are down and they just lay everything out there for you to work with." Second, these statements were often made in private to trusted officials (i.e., the guidance counselor and basketball coach), or to figures of authority (i.e., the superintendent and police officers). Third, the testimony from all of the hearsay witnesses seems consistent—they all recalled that, when asked if Carol Walthart knew of the stu-

dent drinking, the majority of the students stated that she did.

2. *Credibility of witnesses.* Walthart challenges the board's findings with respect to witness credibility. The Code provides the starting point for the credibility analysis. In reviewing the board's decision, *"especially when considering the credibility of witnesses,* the court shall give weight to the fact findings of the board; but shall not be bound by them." Iowa Code § 279.18 (emphasis added); *see also id.* § 279.17 (providing the same directive to adjudicators). We have said that deference is especially appropriate on the witness-credibility issue because "the board is uniquely situated to pass on the credibility of the various witnesses at the hearing." *Justmann,* 476 N.W.2d at 338; *accord Libe v. Bd. of Educ.,* 350 N.W.2d 748, 750 (Iowa Ct.App.1984) (stating that the board is in the best position to adjudge credibility); *cf. Claus v. Whyle,* 526 N.W.2d 519, 524 (Iowa 1994) ("Factual disputes depending heavily on credibility of witnesses are best resolved by the trial court, which has a better opportunity to evaluate credibility than do we.").

The board made specific findings on credibility with respect to each of the witnesses. For the most part, the board found the testimony of witnesses supporting the superintendent's application to be credible—and those who resisted it to lack credibility—and the board gave specific reasons as to each witness with respect to its findings. Here, although some witnesses' testimony conflicted, we conclude that the board's credibility finding is amply supported in the record.

D. *Merits.* Most of the facts are not disputed. On Saturday, September 30, 2000, Carol Walthart's son, Mark, and a number of his friends (all EDCO students) had a "campout" in a large field owned by

Mark's family. The campout began around 2 p.m., but was not in full swing until 7 p.m. There was a fire, music, a tent, and alcohol brought by students. The record shows that neither Carol Walthart nor Dennis knew that alcohol was present at this time. The first time that Carol or Dennis could have acquired knowledge was when they drove down to the campsite at 10 p.m.

At that time, they were returning from dinner at a friend's house, and they wanted to check in on Mark and see how the campout was going. They drove their car down to the site and pulled in approximately fifty feet from the campfire. Mark and his friend, Andy Althoff, walked over to the car to meet them. A conversation ensued, although there is some dispute as to its contents. Dennis and Carol then drove back to their house, which is roughly a mile from the site.

The disputed facts in this case relate solely to whether Carol Walthart discovered that the students were drinking alcohol on her visits to the campsite that evening. The facts accepted by the board are as follows. When Walthart and her husband first visited the campsite at 10 p.m., they talked with Mark and Andy. Walthart's husband asked the boys, "What kind of party is this?" To this Andy replied it was a beer party and that drinking was taking place. Dennis and Carol then left. When Carol returned at 10:45 p.m. with food, she proceeded to take all of the car keys from the male students. When asked why, Carol said that she knew students were drinking, and she did not want anyone to get hurt driving around. As this exchange was taking place at the campsite, Andy and Mark returned to the Walthart residence, where Dennis Walthart had remained. Dennis, apparently suspecting that the boys had been drinking, asked, "You boys aren't driving down to the campsite, are you?" The boys replied that they would not drive and instead would let two girls, who were with them, drive the cars. When the boys returned to the campsite, Carol was just leaving. She asked Andy for his keys, and he gave them to her.

This story is supported by the following testimony. Andy Althoff testified that he told Carol and Dennis, on their first trip to the campsite, that the students were drinking alcohol. His testimony is supported by several other witnesses. First, his coach, Dan Cassutt, testified that Andy confided in him just two days after the accident, telling him that the Waltharts knew about the drinking. Second, the superintendent testified that, about a week after the accident, Andy had told him the same thing. The board found Andy's testimony "most credible."

Another student, Brian Harbaugh, testified that he thought the Waltharts knew of the alcohol consumption. His testimony was supported by the superintendent and Officer Casey Snyder, both of whom interviewed Brian shortly after the incident. The statements Brian made at the hearing are also consistent with the statement he signed after his interview with Officer Snyder. The board found Brian's testimony to be credible.

Another student, Carmen Krapfl, testified that, in her opinion, Dennis Walthart knew that Mark and Andy were drunk at some point during the evening because Dennis told the two boys that the girls should drive to the campfire. Carmen believed he made this request because he knew the boys had been drinking. The board found her testimony to be credible.

The school guidance counselor also testified. Although he did not divulge names (due to confidentiality), he testified that he had talked extensively with a number of the students who attended the party. He

stated that many of those students told him that Walthart knew they were drinking. The board found him credible and gave "great weight" to his testimony.

Walthart's testimony presented quite a different picture. She offered undisputed evidence that she was a nondrinker and that alcohol was rarely present in her household. She claimed that several of the students at the campout had been to her house on other occasions and that alcohol was never a part of those events. She trusted those students and never suspected them of planning a drinking party.

Regarding the events of the evening, she stated that she never saw any alcohol, nor was she told that any was present. When she and Dennis drove down to the site the first time, she spoke with Andy and Mark. She was surprised to see that there was no food, and Dennis asked, "What kind of party is this without food?" The boys said they were hungry. Carol said that she would go back to the house, make some snacks, and bring them back down.

On her trip back to the site with the snacks, she saw a truck driving in a neighboring hay field, which contains dangerous, hidden sinkholes. Also, Dennis had just cut the hay a few days before, and she did not want the boys to damage his crop. She decided to take the keys from all of the boys' vehicles so that they could not drive in the field. She did not take the girls' keys because she did not want them to stay overnight, and she assumed they would not be inclined to drive their cars in a field, anyway. At no point did Walthart observe any drinking or unusual behavior from any of the students, according to her.

Walthart's version is also supported by other evidence in the record. First, Carol and Dennis's testimony support their version of the facts. Second, Officer Steven Trumblee, the officer who interviewed the Waltharts after the accident, testified that

he believed the Waltharts' story. In addition, a few students testified at the hearing that there was "no way" that Carol could have known about the alcohol. They claim they hid all of the evidence when Carol was present because she never would have approved. Further, these students supported Walthart's claim that she took the keys because of the danger of driving in the nearby field.

However, the testimony from the students supporting Walthart's story is suspect for two reasons. First, the three students who were Walthart's strongest advocates were also good friends of her son Mark, having previously spent a lot of time at the Walthart residence. Second, several of these students initially gave statements to police or the superintendent stating that Walthart knew about the drinking, but then recanted those statements at the hearing.

For example, Josh Amling (one of Mark's best friends) originally told the superintendent that Walthart took the keys because she knew that students were drinking. At the hearing, however, Josh stated that Walthart did not know about the drinking. Instead, he changed his testimony to fit Walthart's version—that she took the keys because she did not want the students driving in the nearby field. The board found Josh to be defensive throughout the hearing and determined that his testimony was not credible.

Another such student is Nick Kirby. Shortly after the accident, he was interviewed by Officer Hermes. During that interview, he signed a statement, which read: "Mark's parents didn't supply alcohol as far as I know. I think they knew about the drinking and thats [sic] why they took the keys." At the hearing, Officer Hermes recalled his interview with Nick:

Q. Did [Nick] indicate to you whether or not Carol Walthart had knowledge that students were drinking at the party? A. Yes. He did indicate that to me.

Q. What did he say? A. He said that he believes that Mrs. Walthart knew that they were drinking at the party and that's why they took the keys away.

Q. Did he make a statement to you about alcohol being visible at the party? A. He stated to me at the time, and I think it was the second time Mrs. Walthart came, and that was with the food, that they were sitting around the fire at that time drinking beer, and said that there was beer available—I mean visible at that time.

At the hearing, however, Nick's story changed dramatically. He testified that Walthart did not know about the drinking; in fact, he stated, "[t]here was no way they could have known." Nick testified that his signed written statement did not accurately reflect what he had told Officer Hermes. He asserted that Officer Hermes told him to write the statement regarding Walthart's knowledge, even though Nick did not actually think it was true. At the end of his testimony, Nick claimed that he only agreed to the statement because he was in a hurry and had things to do that day. The board found Nick's testimony not credible.

## V. *Evidence Applied to the "Just Cause" Determination.*

The board found that the superintendent had satisfied his burden to show grounds for termination. The board found Walthart had knowledge that alcohol was being consumed on her property, she allowed that to continue without adequate monitoring, and she did nothing to stop the party except to take some of the car keys. The board concluded this damaged her reputa-

tion as a teacher and was detrimental to her ability to be an effective role model. It found she lacked support from other faculty members, indicating her effectiveness as a teacher was greatly diminished. The board concluded that

[f]or the Board to retain her on the faculty would render its anti-alcohol policy meaningless and subject to utter disregard by the student body and perhaps even the faculty.

We agree. These findings gave the board "just cause" to terminate Walthart's teaching contract.

## VI. *Conclusion.*

On our review of the record, we conclude the board's finding and disposition were supported by a preponderance of the competent evidence. We hold that the district court correctly affirmed the board's decision to terminate Walthart's contract.

**AFFIRMED.**