# IN THE COURT OF APPEALS OF IOWA

No. 21-0199
Filed March 2, 2022

**BRITTANY IONE SAXTON,**
        Plaintiff-Appellee,

**vs.**

**ANDREW LEE KAHILL, JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

        Subject of protective order contests its grant. **REVERSED AND REMANDED.**

        Mark Simons of Simons Law Firm, PLC, West Des Moines, for appellant.

        Tracy A. Eaton of Miller, Zimmerman & Evans, PLC, Des Moines, for appellee.

        Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

Andrew Kahill and Brittany Saxton have a six-year-old son, T.S., in common.  Saxton alleged that Kahill stepped on her foot and "violently shoved" her during a custody exchange of T.S.  The district court granted her request for a protective order.  Kahill now appeals, relying on a video of the incident that Saxton recorded with her phone as evidence that he did not assault her.  After our de novo review of the record, we find no assault and reverse.

Although Kahill and Saxton never married, they lived together and co-parented their son for about two and a half years.  But eventually they separated and shared physical care of T.S.  In September 2020, Kahill went to pick up T.S. from Saxton's home.  When he arrived, Saxton was waiting at the door, phone out, recording.  T.S. stood beside her, a drawing in hand.  Charquan Hargrove, Saxton's fiancé, was down the hall.  Soon into the exchange, T.S. became upset, crying as his father carried him across the street toward his car.

Saxton followed, asking to give T.S. "a hug and a mooch."  But Kahill ignored her and walked toward his car.  Saxton caught up to Kahill as he was buckling T.S. into a booster seat on the passenger side of the backseat.  Although Saxton didn't interfere, she stood just inches from Kahill's side.  Son safely secured, Kahill moved away from the car.  As he did so, he stepped on Saxton's foot.  She responded: "Get off my shoe.  Let me give him a hug and a kiss.  What the hell is your problem?"

But Kahill again ignored her. By then, Hargrove had joined the scene, warning Kahill that "it can all go down right here. You know I'm about that."[1] Seeing that T.S. was still crying, Saxton took matters into her own hands. She opened Kahill's car door and leaned in to say goodbye.

What happened during the next few seconds is unclear—both from witness accounts and the video. Saxton claims Kahill repeatedly threw his weight against the door, striking her back while she was half-inside the car. And she also testified Kahill again stepped on her foot—pinning her to the spot—and shoved her several times. What's more, she claims he made a move for a concealed firearm.[2] On top of that alleged sequence, Hargrove testified that, as Kahill slammed the door on Saxton, he also threw an elbow toward Hargrove.

But Kahill remembers things differently. According to him, after Saxton opened the car, she pushed *him* three times.

Although Saxton recorded the incident, the camera's angle failed to capture all of the contested actions. The video shows Saxton enter the vehicle. Then Kahill's face momentarily flashes on screen. But only after Hargrove has Kahill by the throat, pinned to the car, does Saxton scream: "Get your hands off of me." Once Hargrove lets up, Kahill reaches into his pocket, pulling out his phone to call police. At the scene, officers interviewed Saxton and Hargrove. But not Kahill— his mouth was bleeding so he was taken to a nearby hospital.

---

[1] Hargrove testified that he meant "I'm not about to let my family get abused." But, given animosities between them, Kahill testified he took the statement as a threat.
[2] True, Kahill was lawfully carrying a handgun. But Saxton did not know he had a gun until the altercation ended and police arrived. Plus, the only time he's seen reaching for anything is when he's pulling out his phone to call police.

That same afternoon, Saxton petitioned for relief from domestic abuse under Iowa Code chapter 236 (2020). Soon after, the district court granted a temporary protective order.[3] In January 2021, after a hearing, the court granted a final protective order. This appeal follows.[4]

Chapter 236 is meant to be protective, not punitive. *Christenson v. Christenson*, 472 N.W.2d 279, 280 (Iowa 1991). In our de novo review, we examine the entire record and adjudicate rights anew. *Wilker v. Wilker*, 630 N.W.2d 590, 592 (Iowa 2001). We respectfully consider the district court's factual and credibility findings, but they do not bind us. *Id.*

To obtain a protective order, Saxton had to prove, by a preponderance of the evidence,[5] that (1) she and Kahill had a domestic relationship and (2) he assaulted her. *See* Iowa Code §§ 236.2(2), .4(1), .5(1); 708.1. Kahill concedes the relationship but argues no assault occurred.

---

[3] When Saxton sought the protective order, a separate custody case was pending. That court awarded the parents joint physical care of T.S. The temporary protective order disrupted that arrangement, granting Saxton full rights. But after a November hearing, the prior fifty-fifty shared care was restored.

[4] Only Kahill's counsel filed an appellate brief. Saxton's attorney waived her right to do so.

[5] A preponderance of evidence supports a finding when that evidence is greater "in weight, influence, or force" than the evidence supporting a different conclusion. *Shannon v. Baumgartner*, No. 14-1650, 2015 WL 4935711, at *2 (Iowa Ct. App. Aug. 19, 2015) (quoting *Walthart v. Bd. of Dirs. of Edgewood—Colesburg Cmty. Sch. Dist.*, 694 N.W.2d 740, 744 (Iowa 2005)).

We turn to the relevant assault definitions.  Under section 708.1(2),[6] an assault occurs when, without justification, a person commits:

> a.  Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act.
> b. Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act.

Although codified as a general intent crime, *id.* § 708.1(1), our supreme court has repeatedly characterized assault as a specific intent crime.  *See, e.g.*, *State v. Bedard*, 668 N.W.2d 598, 601 (Iowa 2003) (holding that assault requires proof of specific intent despite the legislature designating it as a general intent crime).  "Specific intent is present when from the circumstances the offender must have subjectively desired the prohibited result."  *State v. Fountain*, 786 N.W.2d 260, 264 (Iowa 2010) (quoting *State v. Redmon*, 244 N.W.2d 792, 797 (Iowa 1976)).  Intent can be inferred from an act's natural consequences.  *State v. Taylor*, 689 N.W.2d 116, 132, 136 (Iowa 2004).

After our de novo review of the record, with emphasis on the video footage,[7] we find insufficient proof that Kahill assaulted Saxton.  We begin with paragraph (a).  Arguably, two moments might qualify as assaultive acts.  The first,

---

[6] The first two alternatives under section 708.1(2) describe different acts. Paragraph (a) reflects the common law crime of battery, an act intended to cause painful physical contact.  *See State v. Yanda*, 146 N.W.2d 255, 255 (Iowa 1966). Paragraph (b) reflects the common law crime of assault, a more preliminary act intended to place another in fear of immediate physical contact.  *See id.* at 256 (describing an assault as "the initial stage of an act which is aggravated by a battery").

[7] "We are happy to allow the videotape to speak for itself."  *Scott v. Harris*, 550 U.S. 372, 379 n.5 (2007).

when Kahill stepped on Saxton's foot as he backed away from his car. The second, after Saxton opened the car door, but before Hargrove grabbed Kahill by the throat.

Foot first, we find no specific intent to make offensive contact. At trial, Saxton asserted that Kahill acted purposefully. But Kahill said he didn't realize he stepped on her foot. The video is not definitive. But it does show Saxton standing just inches from Kahill as he tried to block her access to the car. Given her proximity and his non-engagement, it is more likely than not that he stepped on her foot accidentally.[8]

Moving on, did Kahill assault Saxton after she opened his car door? Again, the video doesn't give a clear answer. But it does show that the entire interaction lasted about five seconds. Those five seconds in mind, let's compare the two competing versions of events.

According to testimony from Saxton and Hargrove, Kahill (1) repeatedly threw his body weight against the open car door; (2) stepped on Saxton's foot, pinning her to the spot; (3) "violently pushed her out of the way" while she was pinned; (4) reached for his concealed weapon; and (5) threw an elbow at Hargrove. Without superhuman speed, we find it implausible that Kahill performed all those acts during this short timeframe.

---

[8] At the hearing, Saxton introduced a picture of her muddy sandaled foot. But no one questions that Kahill stepped on her. The photo does not speak to Kahill's intent.

Timing aside, there's reason to doubt Saxton's and Hargrove's narrative. Saxton and Kahill had an ongoing custody dispute. And, as shown in text messages, the two were not getting along.

Plus, there's the video. As noted, it doesn't corroborate Saxton's version. In fact, it shows Saxton is the person escalating the situation. And on top of that, it appears selectively shot. For example, despite Saxton holding T.S.'s drawing during the entire encounter, the artwork only covers the camera when Hargrove is strangling Kahill. And, post-attack, Saxton trains the camera away from the doubled-over Kahill and toward a nearby home. These observations, coupled with the fact that she's recording from the moment Kahill arrives, give us pause.

But most telling, this isn't the first time police were called to a child exchange. In February 2020, Kahill called police after Hargrove threatened to stab him and "beat [his] ass." True, Hargrove denied the threats, claiming he just wanted to speak with Kahill after Kahill made threats by text. But the texts only insisted that Saxton, not Hargrove, pick up T.S.[9] What's more, Hargrove testified that Kahill reached for his gun during that February exchange. But, echoing this encounter, Kahill was reaching for his phone to call police.[10]

Despite these concerns, the district court believed Saxton. In its terse findings of fact, it noted Saxton's "version of events was corroborated by

---

[9] In a November 2021 order, the district court prohibited Hargrove from participating in child exchanges.

[10] As it turns out, Kahill didn't own a gun in February 2020. He testified that the February incident was the reason he bought the gun. And this is corroborated by his carry permit, which was issued in May 2020.

independent witnesses and the officer who investigated the incident." But let's unpack that corroboration.

First, there's the independent witness. At trial, Saxton's neighbor testified that she saw Kahill strike Saxton three times with the car door. But like the narratives offered by Saxton and Hargrove, the neighbor's recollection is hard to square with the five-second timeline. Plus, the neighbor had an imperfect vantage point. She was one house away "on the other side of the street" and, her view blocked by the car, "could only see, you know, from the top part."

The neighbor also testified that Hargrove ran from Saxton's porch to the car, laying hands on Kahill in just "one fluid movement." But the video contradicts her testimony. True, we don't see Hargrove make his entrance. But we can hear his arrival. About thirty seconds before Saxton enters Kahill's car, Hargrove delivers the warning to Kahill. So he couldn't have been on the porch across the street, like the neighbor testified. Even Hargrove's version contradicts the neighbor's "fluid movement" recounting. Hargrove testified he did not strike Kahill until after Kahill threw an elbow at him. All in all, the neighbor's testimony did not truly corroborate Saxton's story.

Likewise, we do not find the testimony from the investigating officer, Barry Graham, to be corroborative. By and large, Graham's report echoes Saxton's account. He reports that the two yelled at one another, shoved each other, and that Kahill stepped on Saxton, and closed the door on her. But that report is undercut by the video. Kahill remains silent. No shoving—by either party—can be seen. And door closing is, at best, inconclusive. So why did Officer Graham report

otherwise? Turns out, the officer never interviewed Kahill.[11] Having only heard one side, it's no wonder that the report reflects Saxton's narrative. Indeed, the following examination of the officer illustrates the pitfalls of Graham's one-sided investigation:

> Q. She says, "You're going to let me give him a hug and a kiss, Andrew." Is that behavior aggressive? A. Yes
> Q. On whose part? A. On Brittany's part.
> Q. Does it appear to you that Brittany is de-escalating the situation? A. No
> Q. Do you hear any response from Andrew? A. No
> Q. Is he appearing to become aggressive? A. I can only assume from what Brittany told me . . . .
> Q. Okay. But it's not in the video; correct? A. No, ma'am.
> . . . .
> Q. We don't see Andrew assaulting Brittany? A. No, not on the video, ma'am.

Given the shortcomings of both corroborating witnesses and the implausibility of the accounts offered by Saxton and Hargrove, we find Saxton did not meet her burden of proof.[12] In fact, the video footage is more supportive of Kahill's version. He testified that Saxton pushed him three times. Although the camera does not capture Saxton shoving him, he does end up against the car

---

[11] The officer's only interaction with Kahill at the scene was to pat him down before he went to the hospital. And after speaking with Saxton and Hargrove—but before meeting with Kahill—Graham called the county attorney's office. During this conversation, the prosecutor said no charges would be filed. True, the officer eventually met with Kahill at the hospital. But the outcome was already determined. Because no prosecution was contemplated, the officer testified he "didn't spend a lot of time" talking to Kahill. Making matters worse, given his condition, Kahill had trouble speaking during their brief encounter.

[12] As corroboration, Saxton offered a photograph showing "broken blood vessels on [her] back from the car door." The officer testified that she showed him a "scratch mark on her back where she alleged that [Kahill] had grabbed her." But the officer could not verify its origin: "A lot of times we go out, people have scratch marks, it's hard to determine." The officer also agreed that it was plausible that she scraped her back on the car door after she opened it.

within seconds of her opening the door. And as Kahill accurately notes, when Saxton was screaming for him to get his hands off her, he was already pinned against the car, strangled by Hargrove. On this evidence, we cannot find that Saxton proved that Kahill committed an assault under the first alternative.

Turning to paragraph (b) of section 708.1(2), nothing suggests Kahill acted with the specific intent to place Saxton in fear of immediate physical contact. As shown in the video, Saxton is the one escalating the situation. She followed Kahill to his car. Once there, she grew louder, sidled up close behind him, and demanded to kiss her son goodbye. Soon she was joined by Hargrove, a man whom Kahill feared. Hargrove warned Kahill that things can "go down right here." Despite the aggression of both Saxton and Hargrove, Kahill said nothing. Even when Kahill called 911, Saxton remained at his side, yelling over him as he spoke with the dispatcher. After reviewing the record de novo, we find Saxton failed to prove assault under paragraph (b).

Because Saxton did not prove an assault, we reverse the decision to enter a final protective order. We remand for cancellation of the protective order and dismissal of the petition for relief from domestic abuse.

**REVERSED AND REMANDED.**