# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-0064
Filed April 1, 2026

————————————

**Roger Poling,**
Petitioner–Appellee,

v.

**Board of Directors of the Dubuque Community School District,**
Respondent–Appellant.

————————————

Appeal from the Iowa District Court for Dubuque County,
The Honorable Monica Zrinyi Ackley, Judge.

————————————

**REVERSED**

————————————

Jason M. Craig of Ahlers & Cooney, P.C., Des Moines,
attorney for appellant.

Charles Gribble of Gribble Law Firm, Des Moines, attorney for appellee.

————————————

Heard at oral argument
by Tabor, C.J., and Greer, Chicchelly, Buller, and Langholz, JJ.
Opinion by Tabor, C.J.

1

**TABOR, Chief Judge.**

The board of directors of the Dubuque Community School District fired teacher Roger Poling after he used a racial slur when talking to a student. On judicial review, the district court reinstated Poling, finding insufficient evidence to support the board's finding of just cause to terminate his teaching contract. The board appeals.

Because a preponderance of competent evidence supports that Poling made an inappropriate statement to a student and that this conduct impaired his ability to serve as a role model and to maintain effective interactions with students and his colleagues, we reverse the district court's ruling and affirm the board's termination decision.

## I.     Facts and Prior Proceedings

Near the end of the 2023 school year, an incident between a teacher and student at Hempstead High School garnered national attention. Poling was teaching his ninth period multimedia class when a "loud disturbance in the hall" drew his attention away from his classroom. Librarian Katie Houselog also heard the commotion and requested security. Security did not arrive. After another noisy outburst, both Houselog and Poling checked the hallway. Poling said he wanted to ensure that "everyone was safe and that students were where they were supposed to be." When staff appeared in the hallway, students scattered. Houselog returned to the library.

As two students passed by, Poling asked where they should be. One student had a hall pass, but the other gave "a sarcastic answer." Poling then "heard additional commotion in the stairwell." A third student, K.C., was at the top of the stairs. Poling told the students that they should get to their classrooms.

According to Poling, K.C. responded, "What the [fuck] you looking at, [n-word]?"[1] K.C. and the other students then ran down the stairs. At the bottom was security guard Kerry Federonich. Poling called to her that he needed to talk to the student "in the black sweatshirt." The students ran by security and ducked into teacher Janie Hessong's classroom.[2] When Federonich reached that room, she asked K.C. to come out to the hallway. When he caught up, Poling instructed K.C. to see the assistant principal. K.C. refused and asked what he did. Poling described the events:

> . . . I was asking him to come to the hallway. We need to go to the [assistant principal]'s office. And he kept [saying], "What did I do? Why do I need to go? What did I do? What did I do?"
>
> And I said "Because of what you said. You know what you said. Because of what you said."
>
> And then "What did I say?"
>
> So I said "Because you said to me 'What you looking at, N?'" Unfortunately, I said the whole statement.

After Poling uttered the racial slur, the students in the classroom were "in an uproar." Hessong said, "it was just so loud . . . . [T]here was screaming." Then Hessong asked security to watch her classroom so she could walk with K.C. and Poling to the assistant principal's office "to ensure that [K.C.] made it [] safely" and didn't escalate matters. Poling took up the rear. En route, K.C. let a door shut in front of Poling. When Poling

---

[1] The record contains differing versions whether K.C. said, "What the [fuck] you looking at, [n-word]" or "What you looking at, [n-word]."

[2] Hessong is employed with Hempstead through a nonprofit, Iowa Jobs for America's Graduate. She characterizes her room as a safe space where students will sometimes enter even when they do not have a class with her.

complained, K.C. responded, "Shut the fuck up, if Janie wasn't here right now, I would be treating the fuck out of you."

After they reached the assistant principal's office, Hessong returned to her classroom. Assistant principal Karla Schwaegler directed K.C. and two students who had joined him to write their version of events[3] while she spoke with Poling to find out what happened. Poling recounted the events to Schwaegler, again using the racial slur. After seeing Schwaegler's reaction, the gravity of the situation dawned on Poling. He apologized to K.C., who did not accept the apology.[4] Poling and Schwaegler agreed it was the student's right not to accept. By day's end, the district placed Poling on administrative leave.

Meanwhile, two students captured the events on cell phone videos. One video began with Poling saying, "you looked at me and said . . ." and ended with the students' uproar after hearing Poling use the n-word. The other video did not include that initial context. Instead, it only showed Poling saying, "What you looking at, [n-word]?" This second video went viral, gaining over eight million views on TikTok. The district gained unwelcome notoriety from all over the country and was "bombarded with lots of e-mails and phone calls, [and] media requests."

Brian Kuhle, the district's human resources officer, began investigating the same day Poling made the statement. Schwaegler and another assistant principal, Kathy McCarthy, interviewed students. Beyond

---

[3] Schwaegler testified, "our process in the [assistant principal's] office is when a student comes in to report something, we generally give them one of a couple of forms depending upon what they want to report."

[4] Accounts differ whether the idea to apologize originated with Poling or Schwaegler.

the information gathered from students, teachers who were involved wrote statements describing the events. Kuhle also reviewed video footage. After consulting Superintendent Amy Hawkins and legal counsel, the school administration decided to terminate Poling's teaching contract. Kuhle and Hawkins delivered the notice of termination to Poling's house.

The notice listed four reasons for termination:

    1. Making inappropriate and racially derogatory statements directed toward a student at school and in the presence of other students.

    2. Engaging in unprofessional and unethical conduct in violation of Standard VI-25.3(6)(c)&(d) of the Board of Educational Examiners Code of Professional Conduct and Ethics.

    3. Violation of Board policy 1003, Cultural Proficiency Philosophy, on 5/31/23.

    4. Loss of trust and confidence by the administration in employee's ability to serve in a role model capacity for students and maintain effective relationships with students and staff.

After receiving the termination notice, Poling requested a closed hearing with the board under Iowa Code section 279.15(2)(c) (2023). Honoring his request, in July 2023, the board heard from seven witnesses: Assistant Principal Schwaegler, student T.H., teacher Hessong, human resources officer Kuhle, school counselor Rebecca Fellenzer, Superintendent Hawkins, and Poling. The board also admitted forty-eight exhibits.

After considering the evidence, the board found just cause for terminating Poling's teaching contract. In making that finding, the board relied on the first and fourth reasons listed in the termination notice:

Mr. Poling made an inappropriate and racially derogatory statement directed to a student in the presence of students and adults, resulting in the loss of trust and confidence in Mr. Poling to serve in a role model

capacity for all students and diminishing his ability to maintain effective relationships with students and staff.

Poling sought judicial review. The district court reversed, finding insufficient evidence to support the finding of just cause. The board appeals.

## II.    Scope and Standard of Review

We review under the standards provided in Iowa Code section 279.18. *Bd. of Educ. of Fort Madison Cmty. Sch. Dist. v. Youel*, 282 N.W.2d 677, 679–80 (Iowa 1979). That statute governs a teacher's appeal of a school board's decision and defines the court's role[5]:

> 2. In proceedings for judicial review of the board's decision, the court shall not hear any further evidence but shall hear the case upon the certified record. In such judicial review, especially when considering the credibility of witnesses, the court shall give weight to the decision of the board, but shall not be bound by it. The court may affirm the board's decision or remand to the board for further proceedings upon conditions determined by the court. The court shall reverse, modify, or grant any other appropriate equitable or legal relief from the board decision, including declaratory relief, if substantial rights of the petitioner have been prejudiced because the action is any of the following:
>
> > a. In violation of constitutional or statutory provisions.
> >
> > b. In excess of the statutory authority of the board.
> >
> > c. In violation of a board rule or policy or contract.
> >
> > d. Made upon unlawful procedure.
> >
> > e. Affected by other error of law.

[5] An appeal under Iowa Code section 279.18 is separate from review under Iowa Code chapter 17A, the Iowa Administrative Procedure Act. Although distinct, they share similarities. *See Youel*, 282 N.W.2d at 679.

> f. Unsupported by a preponderance of the competent evidence in the record made before the board when that record is viewed as a whole.
>
> g. Unreasonable, arbitrary, or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

Iowa Code § 279.18(2).

As the statute instructs, we give weight to the board's decision, especially on credibility, but we are not bound by it. *Id.*[6] When the record includes disputed facts or when reasonable minds may differ on what inferences to draw, "the board's factual findings should normally be conclusive." *Bd. of Dirs. of Fairfield Cmty. Sch. Dist. v. Justmann*, 476 N.W.2d 335, 338 (Iowa 1991). This deference makes sense because the board is "uniquely situated to pass on the credibility of the various witnesses at the hearing." *Id.* In this appeal from a judicial review order, our job is to determine whether—in applying the standards from section 279.18(2)—we reach the same conclusions as the district court. *See Youel*, 282 N.W.2d at 679 (comparing review under chapter 17A and chapter 279); *Cf. Colwell v. Iowa Dep't of Hum. Servs.*, 923 N.W.2d 225, 231 (Iowa 2019) (discussing review under Iowa Code section 17A.19).

---

[6] The legislature made changes to Iowa Code section 279.18 in 2017. One of those changes suggests that our deference to the board is now broader—applying to the board's entire decision rather than just its findings of fact. *See* 2017 Iowa Acts ch. 2, § 34; *compare* Iowa Code § 279.18(2) (2016) ("In [proceedings for] judicial review, especially when considering the credibility of witnesses, the court shall give weight to the fact findings of the board; but shall not be bound by them."), *with id.* § 279.18(2) (2019) ("In such judicial review, especially when considering the credibility of witnesses, the court shall give weight to the decision of the board, but shall not be bound by it." (emphasis added)).

## III.    Analysis

A school may only terminate a teacher's contract for just cause. Iowa Code §§ 279.15(2), 279.27; *Bd. of Dirs. of Ames Cmty. Sch. Dist. v. Cullinan*, 745 N.W.2d 487, 493 (Iowa 2008). When determining just cause, a school board is limited to the reasons for termination listed in the superintendent's notice. *Youel*, 282 N.W.2d at 680. "This does not mean each [reason] must be considered separately and must itself amount to just cause." *Id.* at 682. Evidence to support one reason may amplify the proof of another reason. *Id.* Here, the board relied on the first and fourth reasons listed in the notice. Thus, we restrict our just-cause review to those two reasons. In defining just cause, our supreme court stated:

> Probably no inflexible "just cause" definition we could devise would be adequate to measure the myriad of situations which may surface in future litigation. It is sufficient here to hold that in the context of teacher fault a "just cause" is one which directly or indirectly significantly and adversely affects what must be the ultimate goal of every school system: high quality education for the district's students. It relates to job performance including leadership and role model effectiveness. It must include the concept that a school district is not married to mediocrity but may dismiss personnel who are neither performing high quality work nor improving in performance. On the other hand, "just cause" cannot include reasons which are arbitrary, unfair, or generated out of some petty vendetta.

*Briggs v. Bd. of Dirs. of Hinton. Cmty. Sch. Dist.*, 282 N.W.2d 740, 743 (Iowa 1979). Under this definition, we assess Poling's "ability and fitness" to discharge the duties of his position. *See id.* at 742. The question on review is whether "a preponderance of the competent evidence in the record . . . viewed as a whole" supports the board's finding of just cause to terminate Poling's teaching contract. *See* Iowa Code § 279.18(2)(f). "While a preponderance of competent evidence is a higher standard than substantial

evidence, this is not de novo review." *Martinek v. Belmond-Klemme Cmty. Sch. Dist.*, 772 N.W.2d 758, 761 (Iowa 2009). And a preponderance is not a weighty standard; it means only that one side's proof is superior "in weight, influence, or force." *Walthart v. Bd. of Dirs. of Edgewood-Colesburg Cmty. Sch. Dist.*, 694 N.W.2d 740, 744 (Iowa 2005) (citation omitted). In fact, a preponderance of the evidence need "not fairly set the question at rest," and may "leave the mind in doubt as to the very truth." *Id.* (citation omitted).

The district court found the record did not contain a preponderance of competent evidence to support the board's decision. On this question we part ways with the district court.

For starters, the district court took an unnecessary detour by determining that the evidence showed Poling was repeating the student's statement, so the slur was not "directed toward" the student. Thus, it found the teacher's behavior did not satisfy the board's first reason for termination. The court also concluded that testimony from Schwaegler and Fellenzer describing the incident's impact on students and staff constituted unreliable hearsay. And finally, the district court concluded that the "social media onslaught" was the true basis for the termination.

In its appeal, the board contends the record included "overwhelming evidence that the incident impaired [Poling's] ability to serve as a role model and to maintain effective relationships with students and staff." We agree with that reading of the record and find the board's just-cause decision was supported by a preponderance of competent evidence.[7] *See* Iowa Code

---

[7] Poling also argues that the school board's decision to fire him was "unreasonable, arbitrary and capricious and clearly an unwarranted exercise of discretion," which reflects the language of section 279.18(2)(g). But Poling does not identify any facts in the record showing "the decision to terminate [was] the result of arbitrariness or capriciousness on

§ 279.18(2)(f). In rejecting the teacher's challenge, we highlight four points of disagreement with the district court's reasoning: (1) the board's decision was not based on improper hearsay; (2) Poling's belief that he was parroting K.C.'s use of the n-word did not lessen the disruption caused by the teacher's poor judgment; (3) even if Poling was not calling the student the n-word, the inappropriate and racially derogatory statement was "directed" toward a student; and (4) the superintendent's recommendation for termination and the board's finding of just cause were properly anchored in the school community's anguished reaction to Poling's conduct and not the broader "social media onslaught."

### A. The board properly considered both direct testimony and hearsay evidence.

We begin by addressing the evidence before the board. The district court found that the board relied too heavily on hearsay evidence in deciding that Poling's statement adversely affected students and staff and that it would continue to do so if he were reinstated as a teacher at Hempstead. Poling echoes that objection in his appellee's brief.

Hearsay evidence is admissible in board hearings.[8] Iowa Code § 279.16(3). The only debate is how much weight to give it. *Walthart*, 694 N.W.2d at 744. The proper weight depends on many factors, such as "the circumstances of the case, the credibility of the witness, the credibility of the

---

the part of the superintendent or board." *See Smith v. Bd. of Educ. of Mediapolis Sch. Dist.*, 334 N.W.2d 150, 152 (Iowa 1983).

[8] A 2017 change to chapter 279 removed the school board's power to subpoena witnesses. *See* 2017 Iowa Acts ch. 2, § 32. Although hearsay evidence was permitted before this change, it may be more essential now that boards lack the ability to compel live witness testimony.

declarant, the circumstances in which the statement was made, the consistency of the statement with other corroborating evidence, and other factors." *Id.* at 744–45. In *Walthart*, the court found it significant that the hearsay statements "were made by adolescent teens just days after the tragedy," were "made in private to trusted officials . . . or to figures of authority," and "the testimony from all the hearsay witnesses seem[ed] consistent." *Id.* at 745.

In its discussion of the hearsay evidence, the district court professed that it was "not re-weighing the evidence" but trying to "create findings that the board did not make." We disagree with that approach. The court improperly assigned greater weight to Poling's recitation of events than to the written summaries of interviews with students and teachers gathered for the board. In our review, we find the board could accept the hearsay evidence as reliable.

The board heard hearsay evidence from school counselor Fellenzer and Assistant Principal Schwaegler. Both testified to student and staff reactions. Students generally felt unsafe and nervous that their teachers were racist. Teachers were ashamed to work at Hempstead and frustrated with Poling's impact on their efforts in building trust.

Many factors support crediting that hearsay evidence. First off, the board believed these witnesses, and we have no reason to do otherwise. *See* Iowa Code § 279.18(2); *Cullinan*, 745 N.W.2d at 493 (giving weight to board's credibility findings). Plus, the hearsay accounts describing the aftermath of Poling's statement were consistent. And for the declarants who were students, the situation resembled that in *Walthart*. They were adolescents speaking to trusted adults in the days after a shocking incident. *See Walthart*, 694 N.W.2d at 745.

And live witnesses corroborated much of the hearsay. For instance, the interview reports revealed that students would avoid classes taught by Poling. Student T.H. expressed that same sentiment at the hearing, "Me personally, if he came back, I would not take his class." She also echoed the hearsay from other students who did not feel safe in the building if Poling were reinstated.

For these reasons, we find that the board properly relied on the totality of evidence, including hearsay.

## B. The board's just-cause determination did not depend on finding Poling's use of the n-word was "unprovoked."

The board next argues that the district court misconstrued the just-cause standard by focusing on whether Poling was merely repeating the student's statement. The board makes two points (1) its decision recognized that "Poling was repeating what he thought K.C. said to him in the stairwell." And (2) "[w]hether K.C. actually said it first was not material to the board's conclusion that Poling used an inappropriate and racially derogatory statement to a student in the presence of other students and staff."

The board is correct. It is immaterial for the just-cause analysis whether the student used the slur first. We care about the teacher's conduct. The superintendent had just cause to fire Poling if that conduct "directly or indirectly" had a significant adverse impact on delivering quality education for the district's students. *See Briggs*, 282 N.W.2d at 743. The board "was not obliged to continue a situation which was disruptive" to that core mission even if a student's misbehavior set the events in motion.[9] *See Youel*, 282

---

[9] On this note, we also find Poling's argument that he has no history of racial animus immaterial. The analysis focuses on the teacher's effectiveness as an educator and role model going forward; it does not look backwards. What's more, Poling's counsel

N.W.2d at 683–84; *Cf. Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) (upholding teacher's suspension for using the n-word in violation of school board policies because he was speaking as a teacher and not a private citizen, even though he used the racial slur as an "attempt to quell student misbehavior, it was still pursuant to his official duties").

And the board's position was supported by evidence at its termination hearing. Kuhle testified that Poling saying the word was the problem, not what precipitated its use. Superintendent Hawkins stated that she recommended termination because Poling said the word regardless of the context. Indeed, Poling himself testified that no context exists, even if quoting a student, in which using a racial slur is appropriate. On this record, we reject the district court's focus on whether Poling was repeating the student's statement.

## C. The board properly determined that Poling "directed" the racial slur toward K.C.

We next consider Poling's contention that the evidence did not support the superintendent's first allegation. As reason one, the termination notice listed: "Making inappropriate and racially derogatory statements directed toward a student at school and in the presence of other students." Because he was repeating K.C.'s language, Poling maintains the racially derogatory statement was not "directed toward a student."

In finding Poling did not direct the statement toward a student, the district court wrote:

---

acknowledged at oral argument that there are cases in which one incident of misconduct can result in just cause for termination.

13

First, the verb/past participle modifying the term toward is "directed," which is defined as, "aim (something) in a particular direction or at a particular person." Second, the term "toward" is defined as "in the direction of." The analysis cannot be only one of semantics. The word choice was made by the superintendent and adopted by the Board. The credible testimony and the entire record support that Poling did not aim the word at a particular person or in the direction of anyone, most importantly, [K.C.]. Poling **repeated** what [K.C.] said; it was not an original thought of Poling.

(Footnotes omitted.)

On appeal, the board disputes the court's interpretation. It cites an on-line dictionary defining "directed" as "to impart orally." *See Direct*, Merriam-Webster Dictionary Online, https://perma.cc/6Q3S-WWVS. From there, the board reasons that Poling directed the statement toward K.C. because the teacher was "speaking directly to a student in front of his peers."

We find the board's reasoning persuasive. Under the board's definition, Poling was imparting the statement toward K.C. regardless of whether the teacher was repeating what had been said. Poling's actions fall within the first reason listed in the notice of termination.

**D. Contrary to the district court's ruling, the "social media onslaught" was not the basis of the superintendent's recommendation to terminate Poling's teaching contract.**

In challenging just cause, Poling points to the negative attention heaped on the school district because of the viral video capturing the incident at Hempstead. This phenomenon troubled the district court:

Magnifying the unfortunate circumstances was the involvement of social media. A student shared a momentary snap shot of the incident widely on social media that did not provide the entire factual scenario. This created clickbait throughout multiple social media platforms, which led to a wider community on social media becoming the prosecutors, judges, and jury. In

turn, this caused a significant amount of pressure on the Board, faculty, students, and individuals involved and impacted.

It's true the school district found itself in the eye of a "social media frenzy." But the evidence before the board focused on the fallout within Hempstead's community and not the agitation outside the schoolhouse gate.

Several witnesses said students and staff no longer trusted Poling. Assistant Principal Schwaegler revealed that she lost confidence in Poling's professional judgment. In her capacity as a counselor, Fellenzer received staff feedback that Poling's actions "ruined all the progress that has been made in creating trust, establishing connections, and making kids feel welcome" at Hempstead. Teacher Hessong described the building as "really sad" the day after the incident and noted that a "lot of the kids didn't come to school the next day." T.H., a student who witnessed the incident and captured it on video, testified that she was shocked by the event.

Beyond trust issues, T.H. testified she would be uncomfortable in the building with Poling. Witnesses Schwaegler, Hessong, and Fellenzer confirmed that other students expressed "feeling unsafe" at Hempstead because of Poling's conduct. In fact, some students open enrolled to a different high school because of this incident. Fellenzer reported that staff members also had safety concerns.

Administrative difficulties also hampered Poling's ability to be an effective role model and teacher. Students didn't want to take his classes. Staff members were embarrassed to be seen with him. Assistant Principal Schwaegler, who considered Poling a friend, testified: "I wouldn't want to be seen standing next to [him] because I feel like that would be betraying my students and their safe space." She described the shame felt by the other teachers: "I've got staff that are angry because they have to apologize to kids,

15

and they have to face the kids that are questioning whether or not they're racist and whether or not they're thinking those words and those things when they go in the classroom." Some staff vowed to quit if Poling returned.

We realize that Poling had little control over the reaction of students and staff to his conduct. But "[t]he fact that [he] may not have been totally responsible for all the ills does not mean his contract cannot be terminated." *Youel*, 282 N.W.2d at 684. Faced with crumbling confidence in Poling's judgment and the sincere safety concerns among students and staff, the board "must have the final say as to how best to bring that intolerable state of affairs to an end as long as the action taken is within the provisions of the statute designed to meet that very problem." *Id.*

Poling has failed to show that he is entitled to reversal of the board's decision. Without dispute, the evidence showed that Poling would face great difficulties in being an effective teacher and role model in the Dubuque Community School District. Just-cause terminations protect the goal of delivering "high quality education for the district's students," *see Briggs*, 282 N.W.2d at 743, and the board could reasonably find that retaining Poling as a teacher would undermine that mission for the Dubuque schools.

To recap, the board properly considered hearsay evidence corroborated by direct testimony. The termination notice applied to Poling's act of directing a racially derogatory statement toward a student—without regard to whether the student used the word first. And the swirl of social media was not the reason that the board adopted the superintendent's recommendation to fire Poling. All in all, we find that a preponderance of competent evidence supports the board's determination of just cause. We

reverse the district court's order and reinstate the board's decision to terminate Poling's contract.

**REVERSED.**