**IN THE COURT OF APPEALS OF IOWA**

No. 21-0890
Filed February 8, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**RAYMOND DUKE BIRDEN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, Linda Fangman,

Judge.


        Raymond Duke Birden appeals his conviction for first-degree murder.

**CONVICTION CONDITIONALLY AFFIRMED, SENTENCE VACATED, AND**

**REMANDED FOR FURTHER PROCEEDINGS.**


        Robert P. Montgomery of Parrish Kruidenier Dunn Gentry Brown &

Bergmann L.L.P., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant

Attorney General, for appellee.


        Heard by Bower, C.J., Tabor, J., and Gamble, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2023).

**BOWER, Chief Judge.**

Raymond Duke Birden appeals his conviction for first-degree murder, in violation of Iowa Code section 707.2(1)(a) (2018).  He asserts the court erred in not submitting to the jury the question of whether DeQundes Glasper was an accomplice whose incriminating testimony requires corroboration.  Birden also contends the trial court erred in denying his motion for new trial based on the weight of the evidence.  We find no error in the court's ruling that Birden failed to meet his threshold burden to prove by a preponderance of the evidence Glasper was an accomplice.  We conditionally affirm Birden's conviction, but we remand for the district court to consider the motion for new trial employing the appropriate standard.

**I. Background Facts and Proceedings.**

At about 5:30 a.m., May 31, 2018, Shavondes Martin's body was found lying in an alley, which ran between several residences.  He had been shot nine times with two types of ammunition.  Neighbors along the alley told investigating officers they heard gun shots around 3:30 a.m.

A convenience store and restaurant lie on the northern end of the alley, and police were able to obtain surveillance video from each location.  The body was found about three-quarters of a block down the alley, around a bend from the southern end where Danaesha Martin lived.[1]  Danaesha and Shavondes were cousins who spoke "[s]ocially, occasionally."

---

[1] Because Shavondes and Denaesha share the last name Martin, we will refer to them by their first names for the remainder of this opinion.

The subsequent investigation led detectives to believe Danaesha; Danaesha's friend, DeQundes Glasper; Glasper's brother, Shaquan Coffer; Coffer's girlfriend, Hanna Widdel; and Coffer's friend, Raymond Birden, all had information about Shavondes's death. Birden was eventually charged with first-degree murder; the State theorized Danaesha was asked by her former boyfriend, Birden, to lure Shavondes into a vehicle and bring him to the alley where Shavondes was ambushed by Birden and Coffer.

At trial, Officer Charles Nichols testified he arrived at the alley around 5:35 a.m. and observed a body lying in the alley with "multiple spots of blood" and a pool of blood on the ground next to the body. The body was in a "very awkward position," and gravel was stuck to the dried blood, as if the body had been turned over. The decedent was wearing socks but no shoes. A cell phone charging cord which had been torn in half was near the body, but no cell phone was found. As Officer Nichols walked back toward his patrol car, which was parked at the southern end of the alley, he came across a pair of black Nike sandals about twenty yards from the body. Officer John Heuer testified he found no wallet on or near the body but he was able to identify the person as Shavondes via a tattoo database. Further testimony established Shavondes had been shot a total of nine times in his neck, head, torso, and legs with a 9-millimeter pistol and a .38-caliber revolver.

Danaesha testified she had known Birden, Coffer, Widdel, and Glasper for ten years as they had been in school together. She and Glasper were friends, she

knew Coffer, and she had been in a relationship with Birden that ended in 2014. Before May 30, 2018, the five had not hung out together.

Danaesha explained she and a person she believed to be the mother of Birden's children arranged to "get high" together the evening of May 30. Danaesha asked who the person was with, and the response was "Duke." Both Coffer and Birden were known as "Duke." Danaesha was picked up at her residence by a tan Jeep driven by Widdel—Coffer was in the front passenger seat, Birden was in the rear seat behind the driver, and Danaesha sat in the rear passenger-side seat. They drove around Waterloo drinking alcohol, smoking marijuana, and listening to music via her cell phone, which was connected to the vehicle's sound system by an auxiliary cord. The four went to Coffer's grandmother's house and parked in the backyard.

Glasper came out of the grandmother's house and got in the car next to Danaesha in the back seat of the Jeep. Danaesha stated the five then took the Jeep to Walgreens and Glasper went in and came back "with a bottle of alcohol." Widdel then "dropped herself off" and another person Danaesha did not know got into the Jeep.

Danaesha testified Birden had taken her phone before Glasper joined them. She stated she had seen both Birden and Coffer with guns that evening. Birden had a "police officer gun" and Coffer had a "cowboy gun." According to Danaesha, Birden and Coffer were using her phone to message Shavondes on Facebook messenger. Birden held her phone on speaker mode and told Danaesha to call

Shavondes and ask him where he was. Shavondes told Danaesha he was on the west side and gave a location.

The prosecutor continued with his direct examination of Danaesha:

Q. At this time, is that unknown individual still with you? A. Yes.
Q. Is [Glasper] still with you? A. Yes.
Q. What was the plan then with regard to Shavondes? A. For me to pick him up.
. . .
Q. At this point in time, do you have a belief about what is going on? A. Yes.
Q. What is that? A. That they wanted me to pick him up.
Q. With regard to why they wanted to pick him up— A. Okay. To my knowledge, at the time, they wanted to pick him up to kill him.
Q. And you knew that? A. I didn't know because they didn't tell me, but my common knowledge would tell me that.
Q. That was your belief at the time? A. Correct.
Q.. Where—so do you ultimately then go pick up Shavondes? A. Yes, I do.

Danaesha testified, "Everyone who was in the Jeep after [Widdel] got dropped off" went to her apartment, where Birden, Coffer, and she left the Jeep and got in a black Mitsubishi Danaesha had rented a few days prior. Danaesha first stated she and Glasper were in the Jeep, but when asked how she knew the Mitsubishi headed toward Shavondes's location, she testified "I know that the rental was by the Westminster because I was the one driving." Glasper and the unknown person were in the Jeep and apparently followed the Mitsubishi because Danaesha testified she returned to the Jeep where Glasper "was in the trunk," i.e., "the far back of the Jeep." While driving the Jeep, Danaesha picked Shavondes up from the side of the street near Westminster, and he got in the front passenger

seat. She testified she and Shavondes were going to "meet up to get high." When Danaesha arrived to pick up Shavondes, other people were with him.[2]

Danaesha testified she and Shavondes then went to drop Glasper off near Hammond Street and he gave her directions.

> Q. Is Hammond close to your residence? A. Yes.
> Q. Do you drive then towards wherever it is on Hammond that you stated he wants to get dropped off? A. Yes.
> Q. Do you park the vehicle or what happens? A. Yes, I parked.
> Q. Were you in a driveway or on the street? A. On the street.
> Q. Was there much traffic out and about at that time? A. No.
> . . . .
> Q. Was it after midnight? A. Yes.
> Q. What happens then after you park the vehicle? A. [Coffer] came to Shavondes' window with a gun, and the third unknown party, he came and took me out of the vehicle and walked me to the rental with Birden.
> . . . .
> Q. How close were the Jeep—the tan Jeep and the rental? A. A couple of feet away from each other.
> Q. How is it that you're taken from the Jeep to the rental? A. The third party walked—well, basically, escorted me to the car.
> Q. Did he have a gun? A. Yes, he did.
> Q. Did [Coffer] have a gun? A. Yes.
> Q. Where was [Birden] situated in the rental? A. [Birden] was in the passenger seat.
> Q. Anybody else in the vehicle? A. No.

Danaesha testified, "They were gonna—apparently trying to murder [Shavondes.]"

Danaesha sat in the driver's seat, and Birden got out of the Mitsubishi and went to the Jeep. Coffer got in the Mitsubishi with Danaesha and told her to "pull off."

> Q. Would it have been towards the vicinity of your house? A. Not really.
> Q. Could you have got to your house from where they left? A. Yes.

---

[2] One of the men looked into the Jeep and asked Danaesha who was in the back. She told them it was "Muff," Glasper's nickname.

Q. Does [Coffer] say anything to you?  A. [Coffer]—well, when me and [Coffer[ was in the car by ourself, he was holding a gun up to me asking me do I think Birden love me.

Q. Is the tan Jeep still there or has it left?  A. The tan Jeep had moved off.

Q. As far as you know, is [Glasper] still in the tan Jeep? A. Correct.

Q. Did the unknown male get back into the tan Jeep after he escorted you to the rental?  A. To my knowledge, the unknown male was driving the tan Jeep.  Shavondes was in the passenger seat, Birden was in the rear passenger, and [Glasper] was in the rear driver's seat.

Q. Where do you and [Coffer] go?  A. For a ride.  We're riding around.

Q. Did you ever hear anything?  A. I heard a single shot.

Danaesha testified she and Coffer drove around for about fifteen minutes and then returned to the street where Coffer and Glasper's grandmother lived. Birden and the unknown person then pulled up in the Jeep.  Glasper was not with them.  For the next several hours, Danaesha, Coffer, and Birden were together in the Mitsubishi.[3]  Danaesha testified she did not get her cellphone back from Birden; he "[s]mashed it, stepped on it."  They made several stops, switched drivers, and eventually drove to Cedar Rapids.  With Coffer driving and Birden in the front passenger seat, from the backseat Danaesha heard Birden tell Coffer that Shavondes had said, "ah-hah, you got me or something like that."

The three returned to Waterloo on May 31.  They discussed Danaesha leaving town, and on June 1, Danaesha—wearing a wig of long hair—attempted to board a bus out of Waterloo, but her bag was too large.  Birden later drove her to Chicago, where she got on a bus.  Police located her several months later in

---

[3] The unknown person was with them for some portion of this time according to Danaesha, but was not with them when they drove to Cedar Rapids.

Virginia.[4]  She returned to Iowa and was facing a conspiracy charge at the time of trial with a possible ten-year suspended sentence.

Danaesha testified she believed Glasper was helping Coffer and Birden. When asked why she believed that she stated, "Because he accepted my phone from him, and if he was my real friend, he would have gave me my phone instead of holding my phone."  She was asked if anything else led to her believe Glasper was involved, "When he told me to drop him off and the car was right there, that that car had came, that's another reason."

Widdel testified she and Coffer were picked up by Birden, who was driving a tan Jeep.  Widdel then started driving and Birden directed her to pick up Danaesha in front of Danaesha's residence on South Street.  After they picked up Danaesha from her home on South Street, they picked up Glasper at Glasper and Coffer's grandmother's house.  At that point in the early evening, Widdel and Coffer were in the front seats; Birden was in the rear seat behind Widdel, Danaesha was in the middle of the back seat, and Glasper was in the rear passenger seat. Together, the group went to Walgreens on Kimball Avenue where Glasper purchased liquor.  Video from Walgreens indicates the purchase happened about 1:00 a.m.  After they left Walgreens, Widdel drove herself home.  Widdel testified Glasper started driving when she got out.

Widdel testified Birden contacted her via Facebook Messenger sometime after May 31—having never done so before—and told her he did not want anyone

---

[4] In two phone calls Danaesha had with law enforcement while she was en route to Virginia, she first denied knowing anything about Shavondes's death, then provided a bit of information but was not "all the way honest."

to know that he was with Danaesha. She also testified she saw Danaesha texting on her own phone while the five were driving around.

Jaryous Cooper testified that on the evening of May 30, he, Shavondes and two others were at an apartment near a church on Waterloo's west side playing video games. Shavondes "took a phone call" and said he was going to leave and was getting a ride with his cousin. Shavondes had his flip phone with him when he left the apartment. Cooper was outside with Shavondes when Shavondes's cousin arrived; there was a male identified as Muff (Glasper) asleep in the backseat of the vehicle.

Investigator Nick Sadd testified about several Facebook Messenger communications between Birden and Shavondes beginning May 10, 2018, recovered from Shavondes's Facebook account.[5] On May 10 and 11, messages between the two appear to be taunts. Then, on May 29, the messages start up again: Shavondes sent a rap audio clip to Birden, followed by a few other messages. At 5:42 p.m. on May 30, Shavondes sent this message to Birden, "We the same type of [n*****] but I'm a different breed I know how to move you don't take notes and all that dissin gone get you a spot by yo brother." At 8:54 p.m., Birden responded, "I Bet Yu Meet Him Before I Do." At 12:47 a.m. on May 31, Shavondes sent Birden a message, "Drop yo location I'll pull up dolo," which Investigator Sadd explained "is an expression for doing it solo or by himself."

---

[5] Birden's Facebook Messenger account during the relevant time period had been deleted.

Investigator Sadd also testified concerning Facebook messages between Danaesha and Shavondes on May 30 that indicate they exchanged phone numbers.

Glasper testified that on May 30, he and a friend were riding around "day drinking." He was dropped off at his grandmother's in the afternoon. He went inside, "grabbed my bottle," and went out back. Glasper later saw Coffer come out of the house. Glasper testified Danaesha, Birden, and Widdel were in a SUV parked in the back of the house. After some conversation, Glasper got in the SUV. Danaesha was driving, Birden was in the front passenger seat, Coffer was in the rear passenger-side seat, Widdel was in the middle back seat, and Glasper got in behind Danaesha. They went "rollin' around, people talking, listening to music, drinking." He stated he did not normally hang out with Danaesha or Birden.

Glasper stated he remembered going to Walgreens and getting a bottle of Grey Goose, riding around some more, and then falling asleep. Glasper testified when he woke up, he was alone in the SUV near Westminster Church. Danaesha walked up to the vehicle, and Glasper told her he was supposed to be going to a friend's, but she "need[ed] [him] to go somewhere with [her]." Glasper and Danaesha started to ride around the neighborhood and when asked where they were going, Danaesha told Glasper she needed to pick up her cousin. After driving around for a bit, Danaesha returned to the area around Westminster Church where Glasper had woken up.[6] Shavondes was outside waiting with Cooper and another

---

[6] Glasper said this "confused" him because she "pretty much" drove in a circle around the neighborhood before returning to pick up Shavondes.

male.  Glasper got into the backseat and Shavondes sat in the front seat.  Glasper heard Danaesha tell someone it was Muff in the backseat.

Glasper said Danaesha "started tweaking . . . doing weird stuff . . . like hitting the brakes" and "swerving," then she told Glasper and Shavondes she needed to "pee."  Shavondes told her to stop at Kwik Star, which was right around the corner.  But, Danaesha "just instantly threw the car in park[ ], hopped out the car and went between the garages."  Glasper could not see her in the dark.  Danaesha returned to the Jeep and continued to drive erratically and said she still had to pee, so she was going to go to her house.  Glasper found her driving odd because she was acting "drunk," but she'd "been driving around all day and never had [a] problem with it . . . and now all of a sudden she [is] just driving outta whack."  Danaesha drove to her residence, parked in an alley at the back of the house, and went inside.  Danaesha was gone longer than the men in the car felt was necessary to use the restroom, and Shavondes got nervous.  Glasper got into the driver's seat to take over the driving, Shavondes moved to the rear passenger seat, and they continued to talk while they waited for Danaesha.

Glasper heard a voice "come out of nowhere" that said, "Yeah, bitch ass n****.  We got you."  Glasper said he looked in the rearview mirror and saw Shavondes putting his head down and shaking it.  Shavondes said, "Damn, y'all got me; y'all got me."  Glasper then saw a black "police gun" come through the rear passenger window pointed at Shavondes.  Glasper was "scared" and he "froze."  He did not look up but believed the voice he heard was Birden's.  Glasper testified he heard the person start listing off names of people he believed Shavondes had

wronged, including Tavis, Birden's brother.[7]  Glasper was told to get his "bitch ass out of the car before I blow your head off, too."  Glasper got out of the car, and, as he was walking away, he saw "multiple people coming outta nowhere."  Glasper then heard someone say, "Get this bitch ass out of the car," and he turned to see Shavondes being grabbed out of the car and taken down the alley behind Danaesha's residence.  Glasper said he got back in the SUV, reversed it, and took off toward the highway.

Glasper was questioned by police and was not "completely honest" at first.  He testified he was scared and did not want to be involved.  He stated he was in the wrong place at the wrong time.

When the defense moved for a directed verdict, it argued both Danaesha and Glasper were accomplices to Shavondes's killing and their testimony could not be used to corroborate each other.  The following exchange occurred:

> THE COURT: I'm asking what facts are you asking the court to rely upon to make a finding that Mr. Glasper would be an accomplice.
> [Defense Counsel]: . . . The testimony of Danaesha Martin is that they were all in it together.  Her testimony as an accomplice is to try to cast blame on someone other than herself, and that can include other accomplices.
> She testified that Mr. Glasper held her phone, kept her phone.  She testified that throughout this evening of May 30th into May 31, 2018, she was under duress.  But it is entirely clear that when she picked up Shavondes Martin that neither Mr. Birden or Mr. Coffer is around with a weapon.
> There's nothing compelling her to act under duress other than the only person with her other than Shavondes was DeQundes Glasper.  So we're asking the court to look at her testimony regarding that as she tries to basically point fingers at everybody else.

---

[7] Otavious "Tavis" Brown was shot and killed in July 2016.  Shavondes was one of three charged with his death, but he was acquitted in February 2018.

She's pointing fingers at what we believe somebody—at someone who can be found factually to be an accomplice to this murder. We also—the evidence shows that Mr. Glasper is the person who asked them to go to Hammond which is where the ambush occurred.

The court ruled the defense had failed to prove by a preponderance of the evidence that Glasper could be found to be an accomplice, explaining merely holding a phone or giving directions to a location could not support a charge of first-degree murder.

The accomplice issue arose again during the court and counsels' discussion concerning jury instructions. The defense objected to the court's proposed instruction, which allowed the jury to determine if Danaesha Martin was an accomplice, but did not allow the same for DeQundes Glasper:

We had a previous discussion when the defense made its motion for judgment of acquittal regarding the testimony of Danaesha Martin. I can repeat that, but I believe that is already on the record. In addition to the evidence of—the testimony of Ms. Martin, there are three videos that the State introduced into evidence. One is a video of DeQundes Glasper at Walgreen's. He's wearing a lighter-colored shirt, I believe light gray. That was taken earlier in the evening of May 30th into May 31st. I believe the timestamp is about 1:00 in the morning May 31, 2018.

The State then introduced a video of Kwik Star for approximately 2:50 a.m. on May 31st. In that video a person identified by Investigator Sadd as . . . Shaquan Coffer gets out of the passenger side of the vehicle. From the front view of the tan-colored Jeep, which is the vehicle, it appears that the driver has a light-colored shirt on.

The evidence is that Mr. Birden, who does not appear in any of the videos in Waterloo, was wearing a dark-colored shirt later on the date of May 31st. . . . Then there's video behind the Gyro Hut. I believe the timestamp is about 2:54. Investigator Sadd said that the times are not entirely synced, but it is the second part of the video going from Kwik Star into the alley where the body of Shavondes Martin is found.

It is our position that the jury could find, as finders of fact, that DeQundes Glasper is the driver of the vehicle because he's wearing

a light-colored shirt. He is Shaquan Coffer's brother; he testified to that. He also testified that there were people who came out into that alley from either side. Those people would have needed to have gone to the alley.

It is our position that the jury could determine that DeQundes Glasper was an accomplice in dropping off Shaquan Coffer to shoot Shavondes Martin in that alley and that there is sufficient evidence to instruct the jury that they may determine that DeQundes Glasper is an accomplice and his testimony would also need to be corroborated.

The prosecution asserted there was no evidence Glasper could be found an accomplice, pointing out:

I believe the specific question during cross-examination of Danaesha Martin was "Do you believe that DeQundes Glasper was helping Shaquan Coffer and Raymond Birden?" Her answer was something to the effect of "I believe so." And the response was because he was continuing to hold her phone. There's been nothing else in the record with regard to that.

The only other thing that would be considered would be Danaesha Martin's testimony that DeQundes Glasper was instructing her where to go after they picked up Shavondes Martin. Other than that, there simply is nothing in this record.

We contest Counsel's assertions about what can be observed on the front seat passenger of the Jeep at Kwik Star. We believe that even if the court were to find that he is, in fact, the driver, that is not enough to amount to someone that could be charged and convicted. We would, for purposes of the record, state that it's the State's theory that they left Kwik Star approximately [thirty] to [forty] minutes before the shots were fired. Other than that, Judge, there's simply nothing in this record that could support any conclusion or any inference that Mr. Glasper was, in fact, an accomplice as defined.

Noting it is the defense's burden to prove by a preponderance of the evidence that someone is an accomplice, the court found insufficient evidence "to prove that Mr. Glasper aided or abetted or assisted in any way other than his mere presence being there."

After the jury returned a verdict finding Birden guilty of first-degree murder, the defense filed a motion for new trial, again asserting the accomplice issue

rendered the evidence insufficient to support the conviction. In the alternative, the defense argued the verdict was against the weight of the evidence.

**II. Scope and Standard of Review.**

We review the accomplice claim for correction of errors at law. *See State v. Douglas*, 675 N.W.2d 567, 570–71 (Iowa 2004).

When reviewing the district court's denial of a motion for new trial under Iowa Rule of Criminal Procedure 2.24(2)(b)(6), we look only to see if the court abused its wide discretion. *See State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). "On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence." *Id.* at 203 (noting the appellate court does not judge witness credibility or reweigh evidence). "However, we review a claim that the district court failed to apply the proper standard in ruling on a motion for new trial for errors at law." *State v. Ary,* 877 N.W.2d 686, 706 (Iowa 2016).

**III. Discussion.**

*Accomplice testimony.* The State cannot convict a defendant based solely on accomplice testimony. Iowa R. Crim. P. 2.21(3). In addition, the testimony of one accomplice may not be used to corroborate the testimony of another accomplice. *State v. Barnes*, 791 N.W.2d 817, 824 (Iowa 2010); *but see State v. Harris*, 589 N.W.2d 239, 242 (Iowa 1999) ("We may affirm a conviction based on the testimony of an alleged accomplice in the absence of corroboration if a properly instructed jury might have found from the evidence that the witness was not an

accomplice."). When relying on accomplice testimony, the State must offer corroborating evidence that independently links the defendant to the crime. *Douglas*, 675 N.W.2d at 568–69. "Corroboration need not be strong nor need it go to the whole case so long as it confirms some material fact connecting the defendant with the crime." *State v. Liggins*, 524 N.W.2d 181, 187 (Iowa 1994).

An accomplice is someone who "could be charged with and convicted of the specific offense for which an accused is on trial."[8] *Douglas*, 675 N.W.2d at 571 (citation omitted). The trial court correctly noted it is the defense's burden to show by a preponderance of the evidence the purported accomplice was somehow involved in the commission of the crime. *See id.* "When the facts and circumstances are undisputed and permit only one inference, whether a witness is an accomplice is a question of law for the court." *Id.* But if the facts are disputed or give rise to different inferences, the accomplice question is for the jury. *Id.*

"A preponderance of the evidence is the evidence 'that is more convincing than opposing evidence' or 'more likely true than not true.'" *In re K.D.*, 975 N.W.2d 310, 320 (Iowa 2022) (citation omitted). "The evidence may preponderate, and yet

---

[8] Our supreme court has explained the test to determine whether an individual is an accomplice:

> We have defined an accomplice as a person who willfully unites in, or is in some way concerned in the commission of a crime. In general, a person is an accomplice if he or she could be charged and convicted of the same offense for which the defendant is on trial. It is not enough, however, to show mere knowledge of the contemplation of a crime or mere presence at the time and place of the crime; it must be established by a preponderance of the evidence the witness was in some way involved in the commission of the crime.

*Barnes*, 791 N.W.2d at 823 (internal citations and quotation marks omitted).

leave the mind in doubt as to the very truth. In such cases the evidence does not fairly set the question at rest, but merely preponderates in favor of that side whereon the doubts have less weight." *Walthart v. Bd. of Dirs. of Edgewood-Colesburg Cmty. Sch. Dist.*, 694 N.W.2d 740, 744 (Iowa 2005) (citation omitted). On our review, we find no error in the court's ruling that Birden failed to meet his threshold burden to prove by a preponderance of the evidence Glasper was an accomplice.

Danaesha testified she was coerced into calling her cousin by Birden. She testified Birden and Coffer were armed. Danaesha said "they wanted me to pick him up" and "they wanted to pick him up to kill him." There is nothing in this record showing Glasper was even present during Danaesha's call to Shavondes.

Glasper was the last of the five to join the "party" on May 30. He had already consumed significant amounts of liquor, and he, Danaesha, and Cooper all testified he was asleep in the back of the vehicle when Danaesha picked Shavondes up. Glasper did not see any guns until he and Shavondes were parked behind Danaesha's house waiting for her to return. The person holding a gun told Glasper get out of the vehicle and leave or he would be shot. Nothing in this record shows Glasper knew of or was part of any plan to kill Shavondes. Glasper wasn't with Birden, Coffer, and Danaesha after the killing when they drove to Cedar Rapids. His mere presence at the scene of the killing is not sufficient to prove someone is an accomplice. *See Douglas*, 675 N.W.2d at 571; *see In re D.F.*, No. 12-0820, 2013 WL 2146458, at *3 (Iowa Ct. App. May 15, 2013) ("D.M.'s mere

presence at the time and place of the crime or knowledge of the crime, . . . is not sufficient to prove he was an accomplice.").

Any evidence that Glasper was an accomplice is marginal at best. Most evidence suggested Glasper was not involved. The defense asserts Glasper would have the same motive to kill Shavondes as Birden, who was purportedly avenging Tavis, but there is no evidence Glasper considered Tavis his "brother" or that they had any relationship. Glasper did not see any guns before one was pointed through the vehicle window while he and Shavondes were parked behind Danaesha's house. Glasper testified, "I don't play with guns. My sister died from a gun." When Glasper told another of his brothers after the killing that he was afraid, Glasper testified it wasn't that he was afraid of being charged, but of having his life threatened.

We conclude Birden did not prove by a preponderance of the evidence Glasper was somehow involved in Shavondes's murder. We find it is highly unlikely that the jury would have found Glasper to be an accomplice. Consequently, we find no error on the trial court's part in instructing the jury only Danaesha could be found an accomplice whose testimony must be corroborated. *See State v. Parker*, No. 21-0414, 2022 WL 2160677, at *3 (Iowa Ct. App. June 15, 2022).[9]

---

[9] In *Parker*, the court acknowledged the victim, Hoffman, was in the defendant's truck because he knew the alleged accomplice, Clayton, but concluded, "There is a lack of evidence that Clayton intended to murder and rob [Hoffman.]" 2022 WL 21606677, at *3. The court concluded "uncontested evidence from Clayton and Gonzalez suggested that Clayton intended to work with Hoffman to sell drugs in Creston," and "Clayton reached out to a friend asking if Hoffman could stay at the

*Motion for New Trial.* Birden contends the trial court erred in denying his motion for new trial based on the weight of the evidence. Iowa courts have the discretion to grant a new trial when "the verdict is contrary to law or evidence." Iowa R. Crim. P. 2.24(2)(b)(6). Our supreme court has held the phrase means "contrary to the weight of the evidence." *State v. Ellis,* 578 N.W.2d 655, 659 (Iowa 1998). "In contrast to a motion for new trial brought under the sufficiency-of-the-evidence standard, a motion for new trial brought under the weight-of-the-evidence standard essentially concedes the evidence adequately supports the jury verdict." *Ary,* 877 N.W.2d at 706. The weight-of-the-evidence standard "is broader than the sufficiency-of-the-evidence standard in that it permits the court to consider the credibility of witnesses." *Id.* "A verdict is contrary to the weight of the evidence only when 'a greater amount of credible evidence supports one side of an issue or cause than the other.'" *Id.* (citation omitted). Birden contends the trial court failed to independently evaluate the credibility of the witnesses. He seeks a remand for reconsideration applying the proper standard.

In ruling on the motion for new trial, the court stated:

> As to the request to have a new trial based on the weight of the evidence, the court is using the weight of the evidence standard and specifically the *Ellis* standard, 578 N.W.2d 655 (Iowa 1998). That test is greater than the sufficiency of the evidence test because it involves questions of credibility and requires the district court to determine whether more credible evidence supports one side or the other. Trial courts are cautioned to exercise this discretion carefully and sparingly *because of the deference owed to the jury's credibility determinations.*
> In this particular case, in looking at the weight of the evidence and the credibility, there is more credible evidence on the side that

friend's residence while he was in Creston," which "is inconsistent with Clayton knowing about or participating in the murder and robbery." *Id.*

Mr. Birden was involved. Starting first, obviously, with the motive and the reason behind it, including in there that even though Ms. Martin seemed to want to distance herself, she admitted that she was the one who set up Shavondes Martin for this meeting, that she was aware that he was going to be killed. There's the evidence that includes the Facebook and phone messaging. There is the evidence that Mr. Glasper says they were sitting outside and two men walked up and he believed the voice to be that of Mr. Birden and that then those two individuals took Mr. Birden down the alleyway and he was shot multiple times. The fact that then you have Mr. Birden, Mr. Coffer, and Danaesha Martin going to Cedar Rapids and driving around and getting out of town and their activity down there. Looking at all of that evidence as well *as giving deference to the jury's decision on the credibility, which is solely their responsibility to find*, the court finds that the weight of the evidence does support the jury's verdict in this matter.

(Emphasis added.)

The correct standard when considering the motion for new trial requires the court make its own credibility determination. *Id.* While initially reciting the correct standard, the court then twice deferred to the jury's credibility determination. We vacate the ruling on the motion for new trial and remand for application of the correct standard. If, after applying the correct standard, the district court determines the motion for new trial should be overruled, then judgment should be affirmed. Conversely, if the district court grants the motion for new trial, the judgment and sentence shall be vacated and a new trial granted. We express no opinion as to whether the verdict is supported by the weight of the evidence.

**CONVICTION CONDITIONALLY AFFIRMED, SENTENCE VACATED, AND REMANDED FOR FURTHER PROCEEDINGS.**